MR. JUSTICE McDONOUGH
delivered the Opinion of the Court.
This opinion concerns questions certified to this Court by the United States District Court for the District of Montana, Great Falls Division, Honorable Paul G. Hatfield presiding. The questions are as follows:
(1) Is the Montana Wrongful Discharge From Employment Act, §§ 39-2-901 to -914, MCA, unconstitutional in that it serves to wrongfully deprive an individual falling within the purview of the Act from his or her right to “full legal redress” within the meaning of Article II, § 16 of the Montana Constitution?
(2) Are those provisions of the Montana Wrongful Discharge From Employment Act which expressly prohibit recovery of noneconomic damages, and limit the recovery of punitive damages, violative of an individual’s right to “full legal redress” within the meaning of Article II, § 16 of the Montana Constitution?
We answer “No” to both questions.
Petitioner Meech’s action in the United States District Court claims damages for wrongful termination from employment, breach of the implied covenant of good faith and fair dealing, and intentional or negligent infliction of emotional distress. Meech also seeks punitive damages for allegedly oppressive, malicious, and unjustifiable conduct on the part of Meech’s former employer, respondent Hillhaven. The claims grew from the alleged wrongful discharge of Meech by Hillhaven. Hillhaven moved to dismiss asserting that the Montana Wrongful Discharge From Employment Act (Act) precluded Meech’s common-law claims. Meech responded to the motion by contending that the Act violated Article II, § 16 of the Montana Constitution. Certification of the questions presented here followed. Before fully answering the questions, a brief summary of the Act aids in understanding the issues.
The Act provides the exclusive remedy and procedure for ac *25 tions formerly governed to a great extent by common-law requirements:
“Preemption of common-law remedies: Except as provided in this part, no claim for discharge may arise from tort or express or implied contract.”
Section 39-2-913, MCA. The Act exempts from its provisions causes of action for discharge governed by other state or federal statutory procedures for contesting discharge disputes. For example, the Act exempts from its provisions, discriminatory discharges, and actions for wrongful discharge from employment covered by written collective bargaining agreements or controlled by a written contract for a specific term. For other wrongful discharge claims, however, the Act provides the exclusive procedure. Sections 39-2-912 to -913, MCA. The Act repeals Montana statutes which formerly granted to both employees and employers the right to terminate the employment relationship for fault on the part of the other party. Sections 39-2-504 to -505, MCA (1985). The Act’s provisions on discharge also limit the operation of § 39-2-503, MCA, Montana’s “at-will” statute. See § 39-2-902, MCA. In place of the prior governing statutes and the common-law causes of action it abrogates, the Act provides a statutorily defined cause of action for wrongful discharge.
The Act broadly defines “discharge” to include constructive discharge. Section 39-2-903, MCA. Covered employees may sue for discharges defined as wrongful under the Act. Section 39-2-904, MCA. Three causes of action for “wrongful” discharge exist under the Act: discharge in retaliation for an employee’s refusal to violate public policy or for reporting a violation of public policy, discharge in violation of the express provisions of the employer’s written personnel policies, and discharge for reasons other than good cause as defined in the Act. The Act limits the time for bringing a cause under its provisions to one year from the date of discharge. Section 39-2-904, MCA.
The Act establishes the extent of employers’ liability for wrongful discharge. Under the Act, plaintiffs have no claim to damages for “pain and suffering, emotional distress, compensatory damages, or punitive damages, or any form of damages, except as provided for in Subsections (1) and (2) [of § 39-2-905, MCA].” Subsections (1) and (2) of § 39-2-905, MCA, provide damages for lost wages and fringe benefits, together with interest thereon for a period not to exceed four years from the date of discharge. The Act defines the value of employee paid pension plans, insurance coverage, vacation time, and *26 sick time as fringe benefits. Subsection (2) provides for an award of punitive damages where claimants can show by clear and convincing evidence actual malice or actual fraud. Interim earnings, including those the claimant could have earned with reasonable diligence, are to be subtracted from the award for lost wages. Section 39-2-905(1), MCA. The Act also provides an incentive for arbitration as an alternative mechanism for settling employment disputes. Section 39-2-913, MCA.
Meech in essence argues that the Act denies his fundamental right to full legal redress under Article II, § 16 of the Montana Constitution. Meech also contends that the Act violates equal protection by denying the fundamental right to full legal redress to a class of claimants without demonstrating that the classification furthers a compelling state interest. See Corrigan v. Janney (Mont. 1981), [192 Mont. 99,] 626 P.2d 838, 38 St.Rep. 545; White v. State (1983), 203 Mont. 363, 661 P.2d 1272; Pfost v. State (1986), [219 Mont. 206,] 713 P.2d 495. Hillhaven answers that the Act does not violate equal protection of the laws or infringe on a fundamental right to full legal redress because Article II, § 16 of the Montana Constitution guarantees only a right of access to courts to seek a remedy for wrongs recognized by common-law or statutory authority, and the legislature may alter common-law causes of action to promote a legitimate state interest. See Shea v. North Butte Mining Co. (1919), 55 Mont. 522, 179 P. 499; Stewart v. Standard Publishing Co. (1936), 102 Mont. 43, 55 P.2d 694; Reeves v. Ille Electric Co. (1976), 170 Mont. 104, 551 P.2d 647. We agree with Hillhaven and overrule Corrigan, White, and Pfost insofar as they hold that Article II, § 16 of the Montana Constitution guarantees a fundamental right to full legal redress.
I.
THE ACT DOES NOT VIOLATE THE FUNDAMENTAL RIGHT OF FULL LEGAL REDRESS, BECAUSE NO SUCH “FUNDAMENTAL RIGHT” IS CREATED BY ARTICLE II, SECTION 16.
Summarized, this section covers the following points:
A. The conclusion that Article II, § 16 of the Montana Constitution does not create a fundamental right results from examination of long-standing, fundamental principles of constitutional interpretation.
B. The basic rule that the legislature may alter the common *27 law harmonizes with an interpretation of Article II, § 16, as only a mandate to the courts.
C. It also follows from the words of the original guarantee, and the meaning intended for the 1972 amendment to the original guarantee, that Article II, § 16, does not guarantee a fundamental right to a particular cause of action, remedy, or redress.
D. Judicial creation of such a fundamental right in this context would also violate the elemental principle of separation of powers.
E. Meech’s arguments on these points are inapposite.
A. Historically, Courts Have Construed Constitutional Guarantees in Light of the Particular Abuses Those Guarantees Seek to Prevent.
In construing a constitutional guarantee, courts “have looked to the object and purpose to be accomplished by the provision.” C.J. Antieau, Constitutional Construction § 3.05 (1982). A “very useful key to the construction [of] a constitutional guarantee is to inquire what was the evil to be removed, and what remedy did the new instrument propose;. . .” C.J. Antieau, Constitutional Construction § 3.05 (1982) (quoting Miller, Lectures on Constitutional Law 82 (1891)).
Construing our speedy remedy guarantee in light of the particular abuses the framers sought to correct supports the argument that the clause does not guarantee a fundamental right to “full legal redress.” The predecessor to Article II, § 16, was Article III, § 6 of the 1889 Montana Constitution, which reads as follows:
“Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character; and that right and justice shall be administered without sale, denial, or delay.”
The principal cases Hillhaven relies on, Shea, Stewart, and Reeves, concluded that Article III, § 6 of the 1889 Constitution did not constrict legislative powers because the article only provided a mandate to the courts to provide equal access to causes of action recognized at law. Shea, 179 P. at 502; Stewart, 55 P.2d at 696; Reeves, 551 P.2d at 651; cf. State ex rel. Carlin v. District Court (1945), 118 Mont. 127, 164 P.2d 155 (trial court’s failure to convene jury for case long awaiting jury trial because of inconvenience to jurors violates the mandate in Montana’s remedy guarantee requiring that courts provide a proper administration of justice); Tooke v. Miles City Production Credit Association (Mont. 1988), [234 Mont. 387,] 763 P.2d *28 1111, 45 St.Rep. 1993 (fact that United States District Courts for the District of Montana deny federal subject matter jurisdiction of tort claims against production credit unions weighs for finding subject matter jurisdiction in Montana District Courts because Montana’s remedy guarantee mandates a forum for claims cognizable according to applicable law).
Legal history demonstrates that Shea and Stewart reached the correct conclusion. Article III, § 6, was not placed in the Constitution as a directive to the legislature. Rather, the guarantee was directed at the courts, and it was framed to provide for equality in the administration of justice. Prior to the decisions in Shea and Stewart, this Court traced the guarantee embodied in Article III, § 6, to Chapter 40 of the Magna Carta. Stephens v. Nacey (1913), 47 Mont. 479, 482-83, 133 P. 361, 362. The Magna Carta’s chapter 40, which contains language similar to the last segment of Article III, § 6, reads as follows:
“To no one will We sell, to none will We deny or delay, right or justice.”
A. E. Howard, Magna Carta: Text and Commentary 43 (1964). The language of the first part of Article III, § 6, providing for a speedy remedy for injury to person, property, and character, resembles commentary on Chapter 40 by the influential 17th century expositor on the common law, Sir Edward Coke:
“And therefore every Subject of this Realm, for injury done to him in bonis, terris, uel persona [i.e., goods, lands, or person], by any other Subject, be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the Law, and have justice and right for the injury done him, freely without sale, fully without any denial, and speedily without delay.” Schuman, Oregon’s Remedy Guarantee, 65 Or. L. Rev. 35, 39 (1986) (quoting E. Coke, Second Institute 55-56 (4th ed. 1671)). Coke’s version of Chapter 40 influenced the content of remedy clauses in many state constitutions:
“The constitutions of thirty-seven states contain passages which, in substance, provide that the courts’ shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation.’. . . [I]t appears most likely that the highly influential Sir Edward Coke, commenting on the Magna Carta more than four centuries after its adoption, was *29 primarily responsible for the contemporary forms of the various certain-remedy provisions.”
Note, Constitutional Guarantees of a Certain Remedy, 49 Iowa L. Rev. 1202, 1202-03 (1964).
Coke’s interpretation of the Magna Carta is, in a broad sense, faithful to its origins. The English feudal nobility sought through Chapter 40 to eliminate abuses in the writ system which governed King’s courts. The abuses in the system made the price of the writ obtained by a would-be litigant a determinant of the quality of justice received. See generally W. McKechnie, The Magna Carta: A Commentary on the Great Charter of King John (2d ed. 1914). The goal of ending the abuses present in the English writ system eventually lead to the embodiment of a greater constitutional principle:
“It is evident that the Magna Carta did not put down the practice of charging heavy fees for writs. Yet this chapter [Chapter 40], although so frequently misunderstood and exaggerated, is still of considerable importance . . . [I]t has been interpreted as a universal guarantee of impartial justice to high and low; and because, when so interpreted, it has become in the hands of patriots in many ages a powerful weapon in the cause of constitutional freedom.”
W. McKechnie, The Magna Carta: A Commentary on the Great Charter of King John 397-98 (2d ed. 1914).
The recognition of the historical meaning of guarantees derived from Chapter 40 as mandating that the courts provide equal access to justice, led to limited interpretations of remedy clauses when plaintiffs claimed the provisions constricted the legislature. Wheeler v. Green (1979), 286 Or. 99, 593 P.2d 777, 789 (citing Davidson v. Rogers (1978) (Linde, J. concurring) 281 Or. 219, 574 P.2d 624); Goldberg v. Musim (1967), 162 Colo. 461, 427 P.2d 698; Shoemaker v. Mountain States Telephone and Telegraph Co. (1976), 38 Colo.App. 321, 559 P.2d 721; Twin Falls Clinic & Hospital Bldg. Corp. v. Hamill (1982), 103 Idaho 19, 644 P.2d 341; Harrison v. Schrader (Tenn. 1978), 569 S.W.2d 822. The concurring opinion in Davidson by Justice Linde set out the rationale for a limited interpretation of the guarantees in remedy clauses as follows:
“The guarantee in article I, § 10, of a ‘remedy by due course of law for injury done [one] in his person, property, or reputation’ is part of a section dealing with the administration of justice. It is a plaintiffs’ clause, addressed to securing the right to set the machinery of the law in motion to recover for harm already done to one of the stated kinds of interest, a guarantee that dates by way of the origi *30 nal state constitutions of 1776 back to King John’s prorpise in Magna Carta chapter 40: . . . It is concerned with securing a remedy from those who administer the law, through courts or otherwise.” Davidson, 574 P.2d at 625-26 (Linde J., concurring) (Emphasis added.). Put another way:
“The guarantee tells those who apply the law when and how they must do so. It says nothing to lawmakers, except insofar as they attempt to interfere with the administration of justice.”
Schuman, Oregon’s Remedy Guarantee, 65 Or. L. Rev. 35, 67 (1986) (emphasis in original).
In Shea, this Court succinctly explained this point holding that Article III, § 6, did not constrict the legislature’s power to replace common-law personal injury actions with actions provided by workers’ compensation legislation:
“A reading of the section discloses that it is addressed exclusively to the courts. The courts are its sole subject-matter, and it relates directly to the duties of the judicial department of the government. It means no more nor less than that, under the provisions of the Constitution and laws constituting them, the courts must be accessible to all persons alike, without discrimination, at the time or times and the place or places for their sitting, and afford a speedy remedy for every wrong recognized by law as being remedial.”
Shea, 179 P. at 502 (emphasis added.) Both Stewart and Reeves quoted Shea for the proposition that the remedy guarantee, as a mandate aimed exclusively at the courts, does not constrict legislative powers.
We agree with Shea, Stewart, and Reeves on this point. The history of the guarantee indicates that framers of state constitutions inserted remedy clauses to insure equal administration of justice. •Clauses insuring equal administration of justice are aimed at the judiciary, not the legislature. Therefore, the history of our provision supports Hillhaven’s argument that our remedy guarantee does not create a fundamental right to full legal redress. Such a reading of the remedy guarantee also accords with another rule recognized in Shea: No one has a vested right to any rule of common law.
B. No One Has a Vested Right to a Rule of Common Law.
The controversy posed by the first question from the United States District Court hinges also on whether Article II, § 16, prohibits the legislature from exercising its plenary power to abrogate the *31 common-law tort causes of action alleged by Meech. The general rule on the constitutional authority of state legislatures is that:
“[T]he people, through the legislature, have plenary power, except in so far as inhibited by the Constitution, and the person who denies the authority in any given instance must be able to point out distinctly the particular provision of the Constitution which limits or prohibits the power exercised.”
Missouri River Power Co. v. Steele (1905), 32 Mont. 433, 438-39, 80 P. 1093,1094. The general rule is also that no one has a vested interest in any rule of common law. Therefore, as a general proposition, the legislature, under its plenary power to act for the general welfare, may alter common-law causes of action. The legislative action may not, however, infringe on constitutional rights. We have already pointed out that historically, Article II, § 16, does not constrict the power of the legislature to alter common-law causes of action. The more specific issue here is whether the legislature may alter or abrogate causes of action sounding in tort.
A tort may be defined as:
“[A] civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages. This, of course, says nothing more than that a tort is one kind of legal wrong, for which the law will give a particular redress . . .
“When it becomes clear that the plaintiff’s interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.
“At the opposite extreme is the bold attempt to reduce the entire law of torts to a single broad principle, that any harm done to another is a wrong, and calls for redress, unless ‘justification’ for it can be shown . . . [T]he rule does not tell us what the law will recognize as ‘harm’ to another, or as ‘justification’ for it. There are many interferences with the plaintiff’s interests, including many instances of negligently causing mere mental suffering without physical consequences or depriving the plaintiff of the benefit of a contract, for which the law will give no remedy, although the defendant has been clearly at fault... It is legal justification which must be looked to: the law will hold the defendant responsible for what the law regards as unjustified — and so stated, the broad rule [remedy for every wrong] means little, or nothing.”
W. L. Prosser, W. P. Keeton, Prosser and Keeton on Torts § 1, at 2-4 (5th ed. 1984) (emphasis in original.) Prosser also explains:
*32 “Tort law is overwhelmingly common law, developed in case-by-case decisionmaking by courts. It is also influenced by statute. Early in the development of American tort law, doctrines emerged with respect to enforcement in tort law of standards derived from criminal statutes. Tort law is affected also by statutes explicitly aimed at changing substantive law rules previously developed by courts. Survival acts and wrongful death acts are examples.”
W. L. Prosser, W. P. Keeton, Prosser and Keeton on Torts § 1, at 19 (5th ed. 1984).
As Prosser demonstrates, wrongs recognized at law are corrected as provided by law. Legislatures in the Anglo-American system have long been held to possess the authority to expand or reduce claims and remedies available at common law. O.W. Holmes, The Common Law 112 (1881). The law of Montana has long recognized that the courts and the legislature establish the substantive law governing tort claims. Early Montana statutes contemplated passage of legislation altering the common law. For example, § 1-1-109, MCA, first enacted as part of the Bannack Statutes, states:
“The common law of England, so far as it is not repugnant to or • inconsistent with the constitution of the United States or the constitution or laws of this state, is the rule of decision in all the courts of this state.” (Emphasis added.)
Similarly, Montana law provides that there “is no common law in any case where the law is declared by statute.” Section 1-1-108, MCA. And statutes in derogation of the common law are “to be liberally construed with a view to effect their objects and to promote justice.” Section 1-2-103, MCA.
The legislature’s exercise of its power to alter the common law supports in a large part our legal system. And as pointed out by Hillhaven, much of the legislation altering the common law concerns the legislature’s decisions on the remedies, redress, or damages obtainable in various causes of action. For example, the legislature has arguably expanded liability in adopting comparative negligence in § 27-1-702, MCA. Similarly, in § 27-1-715, MCA, the legislature has provided a remedy where none previously existed by ordering courts to hold owners of vicious dogs strictly liable in particular circumstances. Recognition of human rights violations under Title 49 of the Montana Code Annotated, prohibition of certain trade practices in the insurance industry under Title 33 of the Montana Code Annotated, and expansion of parents’ liability for children’s torts (§ 40-6-237, MCA) are also instances where the legislature has acted to ex *33 pand available causes of action, remedies, redress, and damages. Other examples undoubtedly exist, and where these legislative expansions govern causes of action, courts and administrative bodies are bound to follow their mandate.
Legislative decisions to expand liability to further various policy objectives are debated and passed almost routinely. In a like manner, for policy reasons, the Legislature debates and passes statutes, that take away causes of action and/or constrict liability. The following are examples: abolition of a cause of action for alienation of affection (§ 27-1-601, MCA), abolition of a cause for breach of promise to marry (§ 27-1-602, MCA), protection for certain persons against a cause of action for libel (§ 27-1-804, MCA), liability limitations for those rendering emergency care at an accident scene (§ 27-1-714, MCA), liability limitations for those furnishing alcoholic beverages (§ 27-1-710, MCA), liability limitations for persons donating food for charity (§ 27-1-716, MCA), liability limitations for agents and volunteers of nonprofit corporations, (§ 27-1-732, MCA), and liability limitations for nonprofit organizations sponsoring rodeos and other events, (§ 27-1-733, MCA). Laws on livestock in open range constitute another legislative limit on liability of parties who are arguably tort-feasors. Section 60-7-202, MCA. Landowners also benefit from legislative limits on liability. For example, under § 23-2-321, MCA, a landowner owes only a duty for acts or omissions that constitute willful or wanton misconduct to individuals making recreational use of surface waters flowing over or through the landowner’s property. Similarly, from a remedy and redress standpoint, property owners benefit from statutory provisions exempting certain property from execution. The Index to the Montana Code Annotated lists over sixty types of property statutorily exempt from execution. These and other statutes constrain liability and limit remedies and redress available at law.
In actions governed by the common law, this Court has also established limitations and expansions of liability. For example, in Miller v. Fallon County (1986), 222 Mont. 214, 721 P.2d 342, 43 St.Rep. 1185, this Court abrogated interspousal tort immunity. Similarly, this Court, acting in its role as lawmaker, recently imposed on employers the duty of good faith and fair dealing. Gates v. Life of Montana Insurance Company (1982), 196 Mont. 178, 638 P.2d 1063. In another decision, breach of the duty of good faith and fair dealing arising from obligations in a lease justified an award of punitive *34 damages. Nicholson v. United Pacific Insurance Co. (1985), 219 Mont. 32, 710 P.2d 1342.
This Court has also refused to expand common law. For example, this Court has affirmed a trial court’s decision disallowing evidence of emotional harm to a shareholder where the tort was committed against the shareholder’s corporation. Moats Trucking Co. v. Gallatin Dairies (Mont. 1988), [231 Mont. 474,] 753 P.2d 883, 45 St.Rep. 772. Another case held that the guarantee under Article II, § 16, does not abrogate a statute of limitations defense. State v. Perry (Mont. 1988), [232 Mont. 456,] 758 P.2d 268, 45 St.Rep. 1192.
The above cited examples of legislative and judicial limitations illustrate that the law, for a variety of policy reasons, refuses to provide a cause of action, remedy and redress for every injury. This proposition is expressed in Latin as damnum absque injuria, meaning a “loss which does not give rise to an action for damages against the person causing it.” Black’s Law Dictionary 345 (4th ed. 1979). The legislation at issue here similarly alters common-law rights and duties and arguably denies a cause of action, remedy, and redress for injuries recognized at common law. If Article II, § 16, guarantees a fundamental right to full legal redress as embodied in common-law causes of action, then a myriad of legislation altering common law in a restrictive manner, as well as the Act, denies this fundamental right. Shea addressed this issue:
“If the contention of counsel should be upheld, the consequence would be that the legislature would be stripped of all power to alter or repeal any portion of the common law relating to accidental injuries or the death of one person by the negligence of another.
“It is true the legislature cannot destroy vested rights. Where an injury has already occurred for which the injured person has a right of action, the legislature cannot deny him a remedy. But at this late day it cannot be controverted that the remedies recognized by the common law in this class of cases, together with all rights of action to arise in [sic] future may be altered or abolished to the extent of destroying actions for injuries or death arising from negligent accident, so long as there is no impairment of rights already accrued.
Shea, 79 P. at 503. As Shea demonstrates, if Article III, § 6, is read as only a directive to the courts to provide for equal administration of justice, then the rule that the legislature may alter the common law does not conflict with the speedy remedy guarantee. Therefore, the general rule that no one has a vested interest in a rule of com *35 mon law refutes Meech’s argument that the Act unconstitutionally deprives him of his fundamental right to full legal redress.
C. The 1972 Amendment to Article III, § 6, Did Non Recognize or Create a Fundamental Right to Full Legal Redress.In 1972, Article III, § 6 of the 1889 Constitution was amended and inserted in the current Constitution as Article II, § 16. The amendment added to the Article as underscored below:
“Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen’s Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay.”
In Reeves, the amended version of Article III, § 6 of the 1889 Constitution was held not to constrict the legislature’s decision to alter common law:
“As indicated in Shea and Stewart, the legislature is not constitutionally prohibited from eliminating common law rights which have not accrued or vested. The Constitution does not freeze common law rights in perpetuity.”
Reeves, 551 P.2d at 652. There was no comment in Reeves on the amendment to Article III, § 6.
1. The Wording Itself. White and Pfost, without discussing governing precedent, reached the opposite conclusion construing Article II, Section 16 of the 1972 Montana Constitution on issues involving governmental immunity and equal protection. White held that Article II, § 16, “guarantees that all persons have a speedy remedy for every injury,” and thus the classification resulting from a cap on tort damages awarded against state governmental entities violated equal protection. White, 661 P.2d at 1275 (Emphasis added.) White then concluded that the legislation violated the guarantee because no compelling state interest justified denying the fundamental right to full legal redress for all injuries. White, 661 P.2d at 1275.
In Pfost, this Court faced an equal protection challenge to an amended version of the damages cap at issue in White. Pfost cited White and again held that Article II, Section 16, provides a “constitutional right to full legal redress for injury.” The phrase “full legal *36 redress” from Article II, § 16, played an important role in this determination:
“The use of the clause ‘this full legal redress’ has major significance. It obviously and grammatically refers to the ‘speedy remedy afforded for every injury of person, property, or character.’ The adjective ‘this’ means the person, thing or idea that is present or near in place, time or thought or that has just been mentioned. Webster’s New Collegiate Dictionary (1981). The constitutional framers thus construed a ‘speedy remedy’ as comprehending ‘full legal redress.’ A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property or character therefore affects a fundamental right and the state must show a compelling state interest.” Pfost, 713 P.2d at 503.
There are flaws in this reasoning. As pointed out by Justice Weber’s dissent in White, rules on the construction of constitutional guarantees favor interpretations of the guarantees in line with former judicial decisions where a constitutional convention has approved a similar or identical provision in a new constitution. White, 661 P.2d at 1279 (citing 2A C. Sands, Sutherland Statutory Construction § 45.12, at 37 (4th ed. 1973))- If “this full legal redress” refers to the speedy remedy in the first clause, then the two references are identical and the Convention approved Shea’s and Stewart’s definition of the guarantee. Shea and Stewart leave little doubt that our remedy provision does not guarantee a fundamental right to a particular cause of action, remedy, or redress. As discussed below, the delegates narrowly drafted the amendment to accomplish the single purpose of limiting the lawmakers’ power in restricting third party actions in workers’ compensation law.
Reliance in Pfost on the definitional and grammatical construction of the guarantee is flawed in other ways as well. For example, the word:
“ ‘injury’ as employed in such a constitutional declaration implies the doing of some act which constitutes an invasion of a legal right as established by statutory or common law, . . .”
16A Am. Jur. 2d Constitutional Law § 616 at 562-63 (2d ed. 1979) (Emphasis added.) Or, as stated by one commentator, a “recognized, pre-existing injury is the predicate, not the subject of the clause.” Schuman, Oregon’s Remedy Guarantee, 65 Or. L. Rev. 35, 67 (1986).
Similarly, the redress referred to is legal redress. Legal means:
“Conforming to the law; according to law; required or permitted by *37 law; not forbidden or discountenanced by law; good and effectual in law.
Black’s Law Dictionary 803 (5th ed. 1979). Legal redress, then, is redress as provided by law, and redress and remedy are necessarily connected to what the law defines as a cause of action.
The words “actions,” “cause of action,” “right,” “remedy,” and “redress” are often used in a legal sense so that one implies the other. In fact, they are so related that at times one necessarily implies the other. However, there are some important distinctions which must be maintained. The term “cause of action” has been defined as follows:
“ ‘[T]he fact or facts which establish or give rise to a right of action, the existence of which affords a party a right to judicial relief.’ The cause of action itself is distinguishable from the form it assumes in its prosecution in the courts. The facts constitute the cause of action, and the legal form used to enforce the action is the remedy.”
State v. Preston (1962), 173 Ohio St. 203, 181 N.E.2d 31, 36 (quoting Norwood v. McDonald (1943), 142 Ohio St. 299, 52 N.E.2d 67, 72). The maxim, “For every wrong there is a remedy” thus bestows upon the person who may be wronged the right to seek redress to be made whole again in an action, whereas the facts which entitle a claimant to legal redress is denominated the “cause of action.” Remedy is neither “redress” nor “relief.” Remedy is “ [t]he means by which a right is enforced or the violation of a right is prevented, redressed, or compensated.” Black’s Law Dictionary 1163 (5th ed. 1979). Therefore, the Act does not deny full legal redress or a speedy remedy. It simply defines what constitutes the facts which must be established to obtain remedy and redress in the context of wrongful discharge.
Similarly, the guarantee of a “speedy remedy” in the first clause of Article II, § 16, means such remedy as is provided by law. This “full legal redress,” following the guarantee of a speedy remedy, refers to the equal right to be made whole again by what the law defines as a cause of action and its elements. Legal requirements and restrictions, as discussed more fully below, may be part of the entire package the law calls a cause of action, remedy, and redress. These restrictions and requirements are not established by our Constitution. Rather, it is the duty of the courts and the legislature to establish what constitutes available causes of action, remedies, and redress. Thus, we disagree with the notion that the proper grammat *38 ical and definitional construction of the words in Article II, § 16 of the Montana Constitution supports the existence of a fundamental right to redress so that the legislature may not alter causes of actions except by a showing that the legislation serves a compelling state interest. There must be the basis or underpinning of a cause of action and remedy as defined by the lawmakers before one arrives at the point of redress.
2. The “Intent of the Framers.” Basic rules of construction favor deriving the meaning of Article II, § 16, from its face. From our discussion above, and apart from what is referred to later in this opinion as the Ashcraft amendment, it is apparent that the words of Article II, § 16, only mandate that the courts provide equal access to causes of action and remedies established by the courts or the legislature. However, even if an ambiguity exists, the debates at the 1972 Constitutional Convention reinforce our initial conclusion.
White’s and Pfost’s interpretation of the effect of the 1972 amendment to the remedy provision ignores the specific meaning ascribed to the provision during debates at the 1972 Constitutional Convention. Pfost, 713 P.2d at 508 (Turnage, C.J., dissenting). Moreover, the majority’s analysis in these decisions overlooks the explanation of the amendment in the Official Text with Explanation of the Proposed 1972 Constitution, a document circulated to inform voters of the content of the Constitution prior to the vote on its adoption in 1972. Our beginning discussion focuses on the proceedings at the Constitutional Convention.
The record from the Constitutional Convention of 1972 demonstrates that the addition to Article III, § 6, was meant to address a specific problem created by this Court’s interpretation of a workers’ compensation statute:
“DELEGATE MURRAY: The committee voted unanimously to retain this section with one important addition. The provision as it stands in the present Constitution guarantees justice and a speedy remedy for all without sale, denial or delay. The Committee felt, in light of a recent interpretation of the Workmen’s Compensation law, that this remedy needed to be explicitly guaranteed to persons who may be employed by one covered by Workmen’s Compensation to work on the facilities of another. Under Montana law, as announced in the recent decision of Ashcraft versus Montana Power Company, [156 Mont. 368, 480 P.2d 812] the employee has no redress against third parties for injuries caused by them if his immediate employer *39 is covered under the Workmen’s Compensation law. The committee feels that this violates the spirit of the guarantee of a speedy remedy for all injuries of person, property or character. It is this specific denial, and this one only, that the committee intends to alter with the following additional wording: [Delegate Murray reads the amendment].”
Montana Constitutional Convention, Vol. V, at 1753-54 (Emphasis added.) Following Delegate Murray’s explanation of the Ashcraft amendment, Delegate Habedank moved for its deletion:
“DELEGATE HABEDANK: Mr. President [Chairman], ladies and gentlemen. I have no objection to this being in here if you put it in here with full knowledge of what you are doing. The decision in the Ashcraft case, which I heard and which was brilliantly argued by Mr. Dahood, made quite a change in what a lot of us thought the law was. However, they were interpreting a specific statute of the State of Montana. All that is necessary to change their interpretation is to amend the statute of the State of Montana. And you, if you adopt this particular provision, are writing into the Constitution by vote of a majority of this group what I consider to be strictly statutory matter.”
Montana Constitutional Convention, Vol. V, at 1755. Delegate Habedank also expressed concern that the addition would extend liability for workers’ injuries beyond correcting the decision in Ashcraft:
“As I view this amendment, it will not allow anyone to recover from anyone else without negligence on the part of the person being charged. However, it will eliminate the ability of you as an owner to hire an independent contractor, require him to carry Workmen’s Compensation as a part of the coverage, and be assured that you will not be sued on a third party claim.”
Montana Constitutional Convention, Vol. V, at 1275. Delegate Dahood, Chairman of the Convention’s Bill of Rights Committee, responded to both arguments made by Habedank:
“I have heard this argument in the Supreme Court, an argument that had no basis in logic. I have heard it by several defense counsel who represent the best of corporate interests, that this is going to affect the individual property owner, and if he hires a contractor, he is going to be exposed to a liability that is unprecedented and they did not experience before. This it totally untrue. This section is doing nothing more, and the wording has been very precisely selected to make sure that it does nothing more, than place the injured *40 working man back in the status that he enjoyed prior to 1971, a very basic constitutional right which he enjoyed for 80 years in the State of Montana. . . Regardless of all this conflict, this technicality, having to use the word ‘Workmen’s Compensation’ in this particular section, which we didn’t want to do, because the minute we did it we knew that somebody would jump up and say it’s legislative, but if you’re going to draft something with precision and you want to make sure that all that you’re doing is returning the law to what it was prior to this decision a year ago, you are compelled, sometimes, in fashioning this precise language to use language that may be seized upon by someone else as legislative. It is not. It is giving back a basic constitutional right that the citizen of Montana had prior to that particular decision.”
Montana Constitutional Convention, Vol. V, at 1255-57 (Emphasis added.)
It is perhaps ironic that the convention delegates amended the Constitution to correct this Court’s restrictive interpretation of a legislative enactment, and subsequently this Court in White and Pfost interpreted the addition to constrict the power of the legislature to alter the common law. At any rate, the testimony before the Convention demonstrates that the amendment to Article II, Section 16, was to operate in only one particular area of law. Specifically, the addition prevents lawmakers, that is both the courts and the legislature, from denying workers’ compensation claimants a cause of action against negligent third parties for job related injuries. The amendment did not seek to define “full legal redress” as a fundamental right which could not be altered by the legislature. The delegates sought to overturn Ashcraft, not Shea. The entire discussion presupposes the existence of legislative powers to alter causes of action, remedies, and redress.
The narrow purpose the delegates ascribed to the change in the remedy guarantee is further reflected in the Proposed 1972 Constitution for the State of Montana, Official Text with Explanation, circulated to the voters prior to the vote on adopting the 1972 Constitution. According to the explanation in the voters’ information pamphlet, the amendment
“Adds to 1889 constitution by specifically granting to a person injured in employment the right to sue a third party causing the injury, except his employer or fellow employee when his employer provides coverage under workmens [sic] compensation laws.”
*41 Proposed 1972 Constitution for the State of Montana, Official Text with Explanation, at 6.
In summary, the history of our remedy guarantee, the rule that the legislature may alter the common law, and the wording of Article II, § 16, support Hillhaven’s assertions that no fundamental right exists to the common-law claims asserted by Meech. The role the judiciary must maintain in interpreting constitutional limitations affecting the plenary power possessed by the people through their legislature, and through their initiative and referendum powers, also supports Hillhaven’s assertions.
D. Deriving A New Fundamental Right From Article II, § 16, Violates Separation Of Powers.
Both courts and legislatures make the substantive law. The Montana Legislature derives its power to make law from the Constitution’s grant of plenary power in Article V, § 1:
“The legislative power is vested in a legislature consisting of a senate and a house of representatives. The people reserve to themselves the powers of initiative and referendum.”
One conclusion which could be drawn from an application of White and Pfost to the legislation at issue in this case is that while the legislature may play a role in expanding common-law causes of action, its attempts to restrict causes of action newly created by this Court fails under the guarantee in Article II, § 16. Yet, the general rule states otherwise:
“[A] constitutional provision that courts of justice shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation, is not intended as a limitation upon the legislative branch of the government where the legislation involved deals with rightful subjects of legislation.”
16A Am. Jur. 2d Constitutional Law § 616, at 564 (2d ed. 1979) (Emphasis added.); and see Salt Lake City v. Utah Light & Traction Co. (1918), 52 Utah 210, 173 P. 556 (provision only applies to judicial questions, not meant to allow courts to usurp legislative power); Wagoner County Election Board v. Plunkett (Okla. 1956), 305 P.2d 525 (provision provides mandate to judiciary, not intended as a limitation on legislative branch).
The interpretation of Article II, Section 16, called for by Meech would prevent the legislature and the people through the initiative process from restricting or modifying the common law relative to *42 injuries of person, property, or character. Only this Court’s reasoning (good or bad), however, would restrict this Court’s own lawmaking function. Our decision to limit a cause of action would withstand the strict scrutiny mandated by Article II, § 16; we would be applying the test. But a similar decision made by the legislature could be subject to much closer scrutiny. This Court would act as the ultimate authority in a vast, expanding, and ever changing field of law governing important social and economic rights and duties. It could exclude the legislature from deciding: What are injuries to an individual’s person, property, or reputation; what wrongs are actionable; what remedies are available; and what redress will be given. The present appeal presents this separation of powers issue.
Gates expanded the law of wrongful discharge by defining as an injury the breach of the implied covenant of good faith and fair dealing. Similarly, Nicholson defined the same injury in the context of a leasehold dispute. Under White’s and Pfost’s interpretation of Article II, § 16, those recently recognized injuries would remain a part of our law despite a legislative mandate to the contrary. Any change in such determinations could only be accomplished through constitutional amendment. We agree with Chief Justice Turnage’s dissent in Pfost on this aspect of the issue:
“There further can be no question that our courts are open to every person and speedy remedy afforded for every injury of person, property, or character; however, this does not mean that the people have been denied the right to act through their legislature in providing a system of law that may set forth the scope and extent of the remedies provided by law, For this Court to decide otherwise requires a denial of the doctrine of separation of powers in Article III, § 1 of the Montana Constitution.”
Pfost, 713 P.2d at 514 (Turnage, C.J., dissenting).
E. Meech’s Arguments Are Inapposite.
Meech has several contentions addressing the arguments supporting Hillhaven’s position. First, Meech points out that in State ex rel. Montana Citizens for the Preservation of Citizens’ Rights v. Waltermire (Mont. 1987), [227 Mont. 85,] 738 P.2d 1255, 44 St.Rep. 913, this Court declared null and void the effect of a voter initiative passed in 1986 amending Article II, § 16, to overrule White and Pfost. The amendment was held invalid because of an error in the voter information pamphlet. Montana Citizens, 738 P.2d at 1264. Meech asserts that the fundamental right to full legal redress re *43 mains in Montana law because the legislature passed the Act under the authority of the invalid amendment.
This proposition depends on the continued vitality of White and Pfost. We are overruling White and Pfost and any decisions relying on White and Pfost to the extent that they hold Article II, § 16, guarantees a fundamental right to a particular cause of action, remedy, or redress.
Meech further contends that the legislation at issue in Shea must be distinguished from the Act. Meech asserts that in Shea, the modification of common law benefited workers, but here, according to Meech, the legislation only “creates employers’ defenses and eliminates many employees’ claims for recovery.” We disagree that the Act must be distinguished from the legislation at issue in Shea for the purpose of testing its constitutionality under Article II, § 16. Shea analyzed the trade-off in employees’ and employers’ interests as a result of the passage of workers’ compensation legislation, but the holding rested on an interpretation of Article III, § 6, as only a mandate to the courts to provide for the equal administration of justice. Shea, 179 P. at 502. Thus, Shea does not require this Court to analyze whether the Act provides an adequate trade for the loss of common-law wrongful termination claims.
However, this Court’s decision in Corrigan could be construed as placing this jurisdiction in with those that require an adequate substitute for legislative acts abrogating common-law remedies. See B. R. Burke, Constitutional Initiative 30: What Constitutional Rights did Montanans Surrender in Hopes of Securing Liability Insurance, 48 Mont. L. Rev. 53, 66 (1987). Even if Montana law required an adequate substitute for legal remedies abrogated by the legislature, as explained below, we disagree that no adequate remedy for common-law wrongful discharge exists under the Act. Therefore, we do not reach the issue.
In conclusion, we answer, “No” to the first question submitted by the United States District Court. Article II, § 16, does not render the Act unconstitutional as depriving an individual, in this case Meech, of a fundamental right to the common-law actions he alleges.
II.
THE ACT SURVIVES EQUAL PROTECTION SCRUTINY BE *44 CAUSE IT IS RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST.
The second question certified from the United States District Court concerns the validity of the Act’s specific limitations on damages. The issue as framed is whether the Act’s prohibition on the recovery of noneconomic damages and punitive damages violates Article II, § 16. Our discussion in answer to this question necessarily extends to an analysis of the equal protection guarantee found in Article II, § 4 of the Montana Constitution.
White and Pfost interpreted Article II, § 16, as guaranteeing a fundamental right of full legal redress for “all recognized compensable components of injury, including the right to be compensated for physical pain and mental anguish and the loss of enjoyment of living.” White, 661 P.2d at 1275. These decisions then went on to hold that the legislation at issue violated the equal protection guarantee because no compelling state interest justified denying the fundamental right found in Article II, § 16, to the class of claimants affected by the damages limitation at issue. Here, the question involving the Act’s damages limitation is similar, and more properly framed as:
“Do the limitations on the recovery of certain damages in the Act violate equal protection because the Act unconstitutionally burdens a class of claimants seeking damages for wrongful discharge? Selection of the proper equal protection test is our first task in determining this issue.”
As discussed in the previous section, no fundamental right to “full legal redress” exists under Article II, § 16. Meech alleges no other infringement of fundamental rights by operation of the Act, and no suspect classifications are involved. The strict scrutiny test applies only where legislative classifications infringe on a fundamental right, or where the legislature employs suspect classifications such as race or national origin to define the benefited or burdened class. See J. E. Nowak, R. D. Rotunda, & J. N. Young, Constitutional Law Ch. 16, § I, at 596-98 (2d ed. 1983). Therefore, the strict scrutiny test does not apply.
We also refuse to employ middle tier scrutiny to analyze classifications created under the Act. The United States Supreme Court has employed the middle tier criterion in only a few situations which are not applicable here. See generally Butte Community Union v. Lewis (1986), 219 Mont. 426, 432-33, 712 P.2d 1309, 1312. This Court’s decisions have applied the test only where specific directives in the *45 Montana Constitution protected interests in education and welfare. See Butte Community Union, 712 P.2d at 1314; Deaconess Medical Center of Billings Inc. v. Department of Social and Rehabilitation Services (Mont. 1986), 222 Mont. 127, 720 P.2d 1165, 43 St.Rep. 1112; State ex rel. Bartmess v. Board of Trustees (1986), 223 Mont. 269, 726 P.2d 801, 43 St.Rep. 1713. Our interpretation of Article II, § 16, as only a directive to the courts distinguishes the interest at issue here from the interests at stake in those cases.
We determine that the proper level of scrutiny for the classifications created by the Act’s limitation on employers’ liability is provided by the rational basis test. We further find that the Act’s provisions on damages pass equal protection muster because the Act’s disparate treatment of similar claims is rationally related to a legitimate state interest.
Until recently, the fundamental body of law governing available damages in the employment area has been contract law. Courts, by virtue of their power to alter the common law, have expanded employers’ liability by recognizing tort claims in the employment context. The legislature has now acted to reverse this trend by restricting damages for wrongful discharge. This decision to limit liability “emerges as a classic example of an economic regulation — a legislative effort to structure and accommodate ‘the burdens and benefits of economic life.’ ” Duke Power Co. v. Carolina Environmental Study Group (1978), 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595, 617-18. A statutory “limitation on recovery is a classic economic regulation,. . . [which] must be upheld if it is reasonably related to a valid legislative purpose.” Boyd v. Búlala (W.D. Va. 1986), 647 F. Supp. 781, 786 (finding heightened scrutiny inappropriate for reviewing liability-limitation under requirements of Virginia’s remedy guarantee).
The Court in Duke Power pointed out that use of the rational basis test harmonizes with the rule that the legislature may alter the common law:
“Our cases have clearly established that ‘[a] person has no property, no vested interest, in any rule of the common law.’ [citation omitted]. The ‘Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible state object,’ [citation omitted], despite the fact that ‘otherwise settled expectations’ may be upset thereby.”
Duke Power, 438 U.S. at 88, n. 32, 98 S.Ct. at 2638, n. 32. The California Supreme Court also emphasized that where the legislature *46 may alter the common law, the rational basis test applies to testing liability-limitations:
“[0]ur past cases make clear that the Legislature retains broad control over the measure, as well as the timing, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest.”
Fein v. Permanente Medical Group (1985), 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, 680 (Emphasis in original.) This Court, too, in Reeves, recognized that the rational basis test applied to analyzing whether liability-limitations imposed through a special statute of limitations for architects and builders violated equal protection:
“The test of the constitutionality of class legislation is whether the classification has some reasonable, just and practical basis and whether the law operates equally upon every person within the class, [citations omitted] A statute will not be stricken down upon constitutional grounds unless its violation of the fundamental law is clear and palpable, and the classification it makes is illusory and unreal, [citation omitted] Applying these tests, § 93-2619, R.C.M.1947, does not violate equal protection of the laws.”
Reeves, 551 P.2d at 652. We hold that these decisions provide the proper rule on which equal protection test applies to analyzing the Act.
Initially, in applying the rational basis test, it is important to note that
“[i]t has long been the general rule of this Court that statutes carry a presumption of. constitutionality, [citation omitted] Generally, ‘whenever there are differing possible interpretations of [a] statute, a constitutional interpretation is favored over one that is not.’ ” Brewer v. Ski Lift, Inc. (Mont. 1988), [234 Mont. 109,] 762 P.2d 226, 228, 45 St.Rep. 1769, 1772 (quoting Department of State Lands v. Pettibone (1985), 216 Mont. 361, 374, 702 P.2d 948, 956).
Another rule pertaining to testing legislation under minimal scrutiny analysis mandates that this Court
“must not be concerned with the expediency of the statute:
“ ‘What a court may think as to the wisdom or expediency of the legislation is beside the question and does not go to the constitutionality of the statute. We must assume that the Legislature was in a position and had the power to pass upon the wisdom of the enact *47 ment, and in the absence of an affirmative showing that there was no valid reason behind the classification, we are powerless to disturb it.’ ”
McClanathan v. Smith (1980), 186 Mont. 56, 66, 606 P.2d 507, 513 (quoting State ex rel. Hammond v. Hager (1972), 160 Mont. 391, 399, 503 P.2d 52, 56). Moreover, in “applying the equal protection clause to social and economic legislation, great latitude is given to state legislatures in making classifications.” McClanathan, 606 P.2d at 513.
The remedy provision in the Act, set out below, arguably classifies wrongful discharge claimants based on the magnitude of harm:
“Remedies. (1) If an employer has committed a wrongful discharge, the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge, together with interest thereon. Interim earnings, including amounts the employee could have earned with reasonable diligence, must be deducted from the amount awarded for lost wages.
“(2) The employee may recover punitive damages otherwise allowed by law if it is established by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the discharge of the employee in violation of 39-2-904(1).
“(3) There is no right under any legal theory to damages for wrongful discharge under this part for pain and suffering, emotional distress, compensatory damages, punitive damages, or any other form of damages, except as provided for in Subsections (1) and (2).” Section 39-2-905, MCA. Claimants alleging only wage loss within a four year period, and only noneconomic damages, are not adversely affected by the Act’s remedy provision. Claimants seeking damages extending beyond four years, or claimants suffering from noneconomic harm such as emotional distress, are foreclosed from pursuing their claims by the Act’s remedy provision. Meech asserts that this difference in available remedies violates equal protection guarantees. In addition, Meech argues that the Act unconstitutionally limits the availability of punitive damages.
The general rule on the plenary power of the legislature in determining the availability of punitive damages refutes Meech’s argument that the Act unconstitutionally limits such damages:
“There is no vested right to exemplary damages and the legislature may, at its will, restrict or deny the allowance of such damages.”
22 Am. Jur. 2d Damages § 239, at 326 (2d ed. 1965). See also White, 661 P.2d at 1276 (tort claimants have no constitutional right to pu *48 nitive damages). We hold that the Act’s provision on punitive damages is constitutional.
We also hold that the Act’s classification of claims by available remedies passes equal protection muster. Again, these types of limitations are not new to law. Limitations on recovery for wrongful death, for recovery against common carriers, and limits for damages on baggage claims are classic examples of liability-limitations. As explained below, we conclude that that the Act rationally relates to promoting a legitimate state interest.
The legislative history of the Act demonstrates that lawmakers perceived an unreasonable financial threat to Montana employers from large judgments in common-law wrongful discharge claims. Testimony in legislative hearings also indicated to legislators that large judgments in common-law wrongful discharge cases could discourage employers from locating their businesses in Montana. The Act’s limitation on damages is intended to alleviate these threats. Therefore, the Act passes muster on this leg of the test because promoting the financial interests of businesses in the State or potentially in the State to improve economic conditions in Montana constitutes a legitimate state goal. Buckman v. Deaconess Hospital (Mont. 1986), [224 Mont. 318,] 730 P.2d 380, 386, 43 St.Rep. 2216, 2223.
We also conclude that the Act relates rationally to promoting Montana’s economic interests. Some awards for common-law wrongful discharge have included wages which extend far into the claimant’s employment future. See Stark v. Circle K Corp. (Mont. 1988), [230 Mont. 468,] 751 P.2d 162, 45 St.Rep. 371. The effect of the Act’s limitations on damages to four years lost wages rationally relates to reducing this potential liability. Moreover, the limit itself is not irrational or so arbitrary that the classification it creates violates equal protection. As a matter of policy, the legislature determined that four years should be the maximum period for consideration of wage loss reasoning that claimants could generally be expected to find similar employment by the end of this period. The time period in any given claim is necessarily speculative. However, statistics before the legislature supported the conclusion that most wrongful discharge claimants with reasonable diligence will obtain other employment within the four year period. Therefore, judicial deference for the time period at issue is appropriate. See e.g., Duke Power, 438 U.S. at 91, 98 S.Ct. at 2640. The same sort of analysis applies to the Act’s limitations on damages for pain and suffering and emotional *49 distress; the restriction on recovery rationally relates to the legislature’s legitimate purpose of limiting employers’ liability for wrongful discharge.
It could be surmised too that this particular limitation relates rationally to another legitimate legislative aim, that is, it provides for greater certainty in defining an employer’s duties by recalling a contract law limitation on damages for pain and suffering. See e.g., § 27-1-310, MCA. As a corollary to this purpose, a greater certainty of the rights of employees also exists under the Act as a result of the “good cause” requirement.
For example, in computing contract damages according to the contemplation of the parties, recovery for
“mental anguish is not, as a general rule, allowed . . . the courts evidently believe that the mental suffering which accompanies a breach of contract is too remote for compensation.”
22 Am. Jur. 2d Damages § 195 (2d ed. 1965). Montana follows the general rule by prohibiting damages for emotional or mental distress in most contract actions. Section 27-1-310, MCA. In contrast, the law generally permits a broader measure of damages in personal injury actions:
“There is no fixed rule or exact standard by which damages can be measured in personal injury cases. The law does not assume that a particular injury calls for a definite amount of compensation, for just compensation may vary widely in different cases, even where the physical injury is the same, especially where the injury is permanent, or where pain and suffering are involved. When a plaintiff suffers pain, fright, or humiliation because of a tort, dollars are awarded as ‘compensation’ but not as the equivalent of what was suffered. Because of this lack of equivalence in a major portion of many personal injury awards, precise rules of damages are impossible to state.”
22 Am. Jur. 2d Damages § 86 (2d ed. 1965) (Emphasis in original.) Montana also follows the general rule on damages for personal injury:
“For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.”
Section 27-1-317, MCA (Emphasis added.)
The differences in calculating personal injury damages and con *50 tract damages points out a problem with the emergence of tort claims in the employment relationship. Tort claims for at-will employees compensate for these workers’ inability to control the term of their employment. Gates, 638 P.2d at 1066. Employers, however, are unable to plan for the extensive liability which may arise from damages available in these claims. Testimony in legislative hearings indicated that this is a source of great discontent in the Montana business community. The Act’s limitation on noneconomic damages applies long-standing contract law in an attempt to solve this problem by dictating a more objective measure of damages. Under the Act, employers benefit because their potential liability is made more certain. Meanwhile, employees’ control over the manner in which they are discharged remains, in part, as a result of the Act’s “good employees’ cause” requirement. The Act, in making this trade, is in no sense irrational. Therefore, classifications in the Act satisfy the requirements of the rational basis test.
Finally, we address the argument mentioned above that Shea requires the legislature to provide adequate substitutes for causes of action abrogated by statute. The Court in Duke Power faced a similar contention based on the Due Process Clause of the United States Constitution:
“The District Court held that the Price-Anderson Act contravened the Due Process Clause because ‘[t]he amount of recovery is not rationally related to the potential losses’; because ‘[t]he Act tends to encourage irresponsibility in matters of safety and environmental protection . . .’; and finally because ‘[t]here is no quid pro quo’ for the liability limitations. 431 F. Supp. at 222-223.”
Duke Power, 438 U.S. at 82, 98 S.Ct. at 2635. The Court in Duke Power-resolved the argument for requiring a quid pro quo as follows:
“Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy. However, we need not resolve the question here since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common law or state law remedies it replaces.”
Duke Power, 438 U.S. at 88, 98 S.Ct. at 2638.
Here, too, the benefits of the Act for employees are not illusory. Therefore, we need not reach the issue as posed by Meech because the Act provides a reasonably just substitute for the common-law causes it abrogates.
In some situations the Act may benefit employees by eliminating *51 common-law defenses formerly available. For example, in Prout v. Sears (Mont. 1989), [236 Mont. 152,] 772 P.2d 288, 46 St.Rep. 257, a majority of this Court explained that under prior Montana law, an employer could defend a discharge suit by claiming that the employee was let go for no cause:
“At the same time we give effect to the employment application and record time card. These give the employer the right to fire without cause.”
Prout, 772 P.2d at 292 (Emphasis added.) Under the Act, the no-cause defense for discharging an employee who has worked beyond the probationary period is unavailable to most employers. Instead, employers may be subject to discharge only for good cause defined as:
“ ‘Good Cause’ means reasonable job-related grounds for dismissal based on failure to satisfactorily perform job duties, disruption of the employer’s operation, or other legitimate business reason.”
Section 39-2-903(5), MCA. Similarly, the good-cause provision may provide greater protection for an employee whose employer has carefully avoided giving objective manifestations of continued employment, a requirement for maintaining a cause of action for violation of the covenant of good faith and fair dealing under the former law. Stark, 751 P.2d at 166. Imposition of a good-cause requirement in discharge may also provide greater employee protection in situations, as in Prout, where employers sought to disclaim in the employment contract any objective manifestations of continued employment. The Act’s provision allowing claims for prejudgment interest also betters the prior common-law provisions for recovery.
In addition to the amount awarded for lost wages, pensions, insurance benefits, and vacation time may be considered as fringe benefits under the statute. Section 39-2-903(4), MCA. All fringe benefits which would have accrued during the four year period following the discharge are available as damages under the Act. Therefore, the Act contemplates allowing some recovery for wrongful discharges which would otherwise deny retirement benefits, and more.
To summarize, greater certainty in the law may alleviate problems experienced by both employers and employees. As explained by one commentator:
“[T]he employees who benefit [under common-law cause of action] are few and far between, first, because of the difficulties involved in staying the course of a lengthy and expensive judicial process, and *52 second, because of limitations inherent in the legal doctrines adopted by the courts.”
Gould, Stemming the Wrongful Discharge Tide: A Case for Arbitration, 13 Emp. Rel. L.J. 404, 413 (1988). Therefore, Meech’s argument that the Act provides an inadequate trade for prior common-law actions fails to provide authority for finding the Act unconstitutional.
In conclusion, Montana’s remedy clause seeks to guarantee equal access to courts to obtain remedies for injuries as provided by governing law. It does not, however, impart a definition of what the law considers a remedy or full legal redress. Nor does it empower this Court to exclude the legislature from defining what are legal injuries.
Finally, we make clear here that the proper test to apply to the Act’s classifications burdening one class and not another, is the rational basis test. The classifications created under the Act at issue here survive scrutiny under this test, and even if Montana law required a quid pro quo for the old causes of actions, the Act provides a reasonable substitute. Thus, we answer “No” to both questions posed by the United States District Court.
MR. CHIEF JUSTICE TURNAGE and MR. JUSTICES GULBRANDSON and WEBER concur.