*178 LANDAU, J.,
concurring.
The court’s decision in this case turns on whether the common law in 1857 would have recognized plaintiffs claim. I do not quarrel with that. The sort of imaginative reconstruction of nineteenth-century case law in which the court engages is precisely what its precedents require. My quarrel is with those precedents.
I am skeptical of those precedents in two respects. First, at a more general level, I contest the notion that this state’s constitution today means no more than what it meant in 1857. That proposition is at the core of the controlling decisions in this case—Smothers v. Gresham Transfer, Inc., 332 Or 83, 23 P3d 333 (2001), and Hughes v. PeaceHealth, 344 Or 142, 178 P3d 225 (2008), in particular. In my view, the sort of hyper-originalism that those decisions both require and purport to reflect is untenable. As I argued in my concurring opinion in State v. Hemenway, 353 Or 129, 154, 295 P3d 617 (2013) (Landau, J., concurring), vac’d by State v. Hemenway, 353 Or 498, 302 P3d 413 (2013), there is little evidence that the framers of the Oregon Constitution intended that their intentions or understandings would be forever controlling. Even assuming that the framers’ intentions or understandings are controlling, the fact remains that those intentions or understandings are often unknowable or are unknown to us. And even in those cases in which they are known, it is often impossible to apply those intentions or understandings to modern circumstances without transforming them in ways that would have been utterly foreign to the framers.
Second, I have my doubts about the controlling decisions themselves. That is to say, even assuming for the sake of argument that the Oregon Constitution means only what it was intended to mean in 1857, I question whether the framers intended the interpretations that this court adopted in Smothers and Hughes.
I begin with Smothers. In that case, this court concluded that the exclusive remedy provision of the state workers’ compensation statute violated the remedy clause of Article I, section 10, of the Oregon Constitution. In the view *179 of the court, “the drafters of Article I, section 10, sought to give constitutional protection to absolute rights respecting person, property, and reputation as those rights were understood in 1857.” 332 Or at 115. The purpose of the remedy clause, the court stated, was to preserve from legislative abolition rights that had become “vested” as of the time of the adoption of the constitution. Id. at 116.
The court acknowledged that direct evidence of what the framers of the Oregon Constitution intended “admittedly is sketchy.” 332 Or at 114. In fact, the court found no discussion of Article I, section 10, in the records of the constitutional convention.[1] The court nevertheless concluded that, by the mid-nineteenth century, there had developed a well-established understanding about what constitutional remedy guarantees meant, and nothing in the historical record suggested that the framers of the Oregon Constitution intended to depart from that understanding. Id.
Based on that historical analysis, the court concluded that, to determine whether a statute violates the remedy clause guarantee entails a two-part inquiry: To begin with, it must be determined, “when the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury?” Id. at 124. If the answer to that question is no, then the *180 inquiry is at an end. If the answer is yes, and the legislature has abolished that common-law claim, then “the second question is whether [the legislature] has provided a constitutionally adequate remedy for the common-law cause of action for that injury.” Id.
Applying that test to the exclusive remedy statute at issue, the court in Smothers answered the first question in the affirmative — that is, the court concluded that, in 1857, the common law recognized a claim by an employee against an employer for negligent injury during employment. And it answered the second question in the negative — that is, the substitution of workers’ compensation for common-law negligence claims was constitutionally inadequate because the more rigorous causation standard that applies to workers’ compensation claims left some claims that would have been compensable at common law beyond remedy. Id. at 133-34.
The court’s historical analysis is the focus of my concern. It appears to me that, in a number of important respects, the court’s analysis in Smothers is difficult to reconcile with the historical record.
In brief, the court in Smothers traced the origins of the remedy clause to Magna Carta, as explained by Coke and Blackstone; as informed by the common-law maxim ubi jus, ibi remedium (where there is a right, there must be a remedy); and as taken up by nineteenth-century constitution framers who were hostile to legislative authority. 332 Or at 94-112. As far as I can tell, pretty much everyone agrees with the initial proposition that state remedy clauses have their genesis in section 29 of the 1225 version of Magna Carta, which provides that
“[n]o freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right.”
So far, so good.
The court gets into trouble, however, in its reading of Coke’s commentary on the final sentence of Chapter 29. *181 According to the Smothers court, “Coke asserted that the common law of England had come to guarantee every subject a legal remedy for injury to goods, lands, or person caused by any other subject.” 332 Or at 96-97. The court cited no authority for that characterization of Coke’s take on that portion of Magna Carta. As far as I can tell, there is no authority for it.
What Coke was writing about was royal — that is, the king’s — interference with the judiciary. David Schuman, The Right to a Remedy, 65 Temple L Rev 1197, 1200 (1992) (“At the time of Magna Carta, the evil was corrupt courts.”). The immediate context within which Coke wrote his commentary bears out the point. King James I, as absolute monarch, had asserted the authority to appoint or remove judges at his pleasure and to influence their decisions at will. See generally William S. Holdsworth, 5 A History of English Law 423-56 (1924) (on the conflict between the king and Coke concerning crown control of the courts). Coke asserted that the common law took precedence over the authority of the king.[2] In that context, he wrote in the Second Institutes that
*182 “every subject of this realme, for injury done to him in bonis, terris vel persona, by any other subject, be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay.”
Edward Coke, The Second Part of the Institutes of the Laws of England 55 (1797). The quote responds to the abuses of the king, including the sale of justice, corrupt appointments, and interference with judicial decisions. See generally Jonathan M. Hoffman, By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions, 74 Or L Rev 1279, 1288 (1995) (“Royal interference with the common-law courts incited Sir Edward Coke’s fight with the Crown and inspired his reinterpretation of Magna Carta in his Second Institute”). It was about who was entitled to justice from the courts — everyone, regardless of class or station — and how remedies are to be administered under law — “freely without sale, fully without any deniall, and speedily without delay.” Nothing in the historical context of Coke’s Second Institutes suggests that his point was that the courts were the guardians of a substantive right to remedy against intrusions by Parliament. To the contrary, corrupt courts were the problem for Coke. Smothers, in suggesting that Coke was about protecting against legislative interference with common-law remedies, turns Coke on his head, transforming his discussion about royal corruption of courts into a declaration of rights as against parliamentary interference.
The court also runs into trouble in its appeal to Blackstone’s Commentaries. According to the court in Smothers,
“Blaekstone explained that the common law viewed Englishmen as having both absolute and relative rights. *** Absolute rights are founded on immutable laws of nature and reason, and usually are called liberties.
«Hi * * * Hi
“Blaekstone echoed Coke in stating that it would be ‘in vain’ for the law to recognize rights, if it were not for the remedial part of the law that provides the methods for *183 restoring those rights when they wrongfully are withheld or invaded.”
332 Or at 98-99 (citations omitted).
Once again, the court appears to have extracted quotations from their context and summarized them to stand for something that would have been foreign to their source. Certainly, Blackstone spoke of absolute rights. The entire first chapter of Book I of his Commentaries concerns “the absolute rights of individuals.” William Blackstone, 1 Commentaries on the Laws of England *117. But Blackstone viewed absolute rights as such only in a state of nature. Id. at *119 (“By the absolute rights of individuals we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature.”). He did not regard them as absolute in the sense of being immune from change or limitation by the legislature. See Albert W. Alschuler, Rediscovering Blackstone, 145 U Pa L Rev 1, 28 (1996) (Blackstone did not “view rights within political communities as ‘absolute’ in the sense that they were unqualified or unrestricted.”); Bradley J. Nicholson, A Sense of the Oregon Constitution 209 (2011) (http://www. asenseoftheoregonconstitution.com) (“[D] espite Blackstone’s characterization of particular rights as ‘absolute,’ they always were subject to legislative alteration.”).
To the contrary, Blackstone explicitly stated that even so-called “absolute rights” were subject to regulation by Parliament in the public interest. See, e.g., Robert P. Burns, Blackstone’s Theory of the “Absolute” Rights of Property, 54 U Cinn L Rev 67, 73 (1985) (In Blackstone’s view, “absolute rights may be curtailed by necessary sacrifices, imposed by positive law, for the blessings of civilized society.”); Jeffrey D. Jackson, Blackstone’s Ninth Amendment: A Historical Common Law Baseline for the Interpretation of Unenumerated Rights, 62 Okla L Rev 167, 208 (2010) (Absolute rights, to Blackstone, “are not ‘absolute’ in all applications. Rather, they are bound by ‘the laws of the land,’ that is, by the valid laws enacted to protect and regulate society.”). In Blackstone’s view, we relinquish some of our absolute rights when we become members of a political community. Blackstone, 1 Commentaries at *121 (“But every man, when he enters into *184 society, gives up a part of his natural liberty.”). As a result, otherwise absolute rights give way to laws that are “necessary and expedient for the general advantage of the pub-lick.” Id. Thus, Blackstone cautions that, although the rights are denominated “absolute,” they are subject “at times to fluctuate and change: their establishment (excellent as it is) being still human.” Id. at *123. To Blackstone, the common law was not frozen; rather, Parliament possessed authority to enlarge “the common law where it was too narrow and circumscribed” and “restraint] it where it was too lax and luxuriant.” Id. at *86-87.
To say then, as Smothers does, that Blackstone asserted a common-law right to a remedy superior to legislative authority is quite at odds with what Blackstone actually said. See Thomas R. Phillips, The Constitutional Right to a Remedy, 78 NYU L Rev 1309, 1323 (2003) (“Blackstone clearly saw the remedies guarantee only as a check on royal and other ‘private’ abuses of power, not parliamentary excess.”); Nicholson, A Sense of the Oregon Constitution at 208 (“ [Consistent with the scope of the 18th-century doctrine of parliamentary supremacy, *** Blackstone apparently believed that parliament was more trustworthy than the judiciary.”).
In a related vein, the court runs into further problems in invoking the hoary ubi jus maxim.[3] According to the Smothers court, “the purpose of the remedy clause is to make the common-law maxim that there is no wrong without a remedy a ‘fixed and permanent rule in this state.’” 332 Or at 115. As authority for that proposition, the court cited its own decision in Platt v. Newberg et al., 104 Or 148, 153, 205 P 296 (1922), which, in turn, cited the Corpus Juris Secundum, which simply stated that state remedy clauses trace to Magna Carta. In fact, I am aware of no support for *185 the notion that state remedy clauses were intended to effectuate the ancient ubi jus maxim.
It appears that the maxim had an entirely different purpose. It was cited by early common-law courts as authority for courts to create remedies where statutes proved inadequate. See generally Jonathan M. Hoffman, Questions Before Answers: The Ongoing Search to Understand the Origins of the Open Courts Clause, 32 Rutgers LJ 1005, 1010 (2001) (“[W]hatever its source, the Maxim was historically applied to effectuate legislative policy, not to thwart it.” (Emphasis in original.)). Thus, if statutes did not provide a remedy for a given wrong, courts regarded themselves as empowered to supply the needed remedy. That, at least, is how mid-nineteenth-century cases viewed the maxim. See, e.g., Stearns v. Atlantic & St L R Co, 46 Me 95, 102 (1858) (“But the absence of all statutory remedy compels the plaintiff to rely upon common law authority for bringing an ‘action upon the case.’”). It was cited as authority for courts to add to the legislature’s exercise of its lawmaking authority. I can find no authority for the proposition that the maxim operated to prevent legislatures from exercising their authority to modify or eliminate common-law remedies, which is another matter entirely.
The Smothers court encounters additional trouble in relying on the framers’ “mistrust of legislative power” as a basis for its reading of the remedy clause of Article I, section 10. To be sure, mid-nineteenth-century framers of state constitutions mistrusted legislative power. See generally Kermit L. Hall, The Magic Mirror: Law in American History 89,103-05 (1989) (“The populist and antigovernmental stirrings of the late 1840s and 1850s climaxed in an outburst of constitutional reform that diminished legislative power.”). But that mistrust had specific focus in response to specific past abuses of legislative power — in particular, corruption in the legislative process and lack of deliberation on the passage of laws, see generally Robert F. Williams, State Constitutional Limits on Legislative Procedure, reprinted in 48 U Pitt L Rev 797 (1987); adoption of laws that transferred large swaths of land by fiat, see generally James Willard Hurst, The Growth of American Law: The Law Makers 241-42 (1950); Mark A. *186 Graber, Naked Land Transfers and American Constitutional Development, 53 Vand L Rev 71 (2000); and other laws that granted special privileges and immunities to favored individuals or businesses, see generally G. Alan Tarr and Robert F. Williams eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform 21 (2006) (“A number of states include in their constitutions a curb on granting ‘special’ or ‘exclusive’ privileges, after a series of abuses by the relatively unfettered state legislatures responding to powerful economic interests.”); Kurt T. Lash, The Origins of the Privileges or Immunities Clause, Part I: “Privileges and Immunities” as an Antebellum Term of Art, 98 Geo LJ 1241, 1253 (2010); David Schuman, The Right to “Equal Privileges and Immunities”: A State’s Version of “Equal Protection,” 13 Vt L Rev 221, 223 (1988). Those abuses led to the adoption of enactment requirements that promoted openness and deliberation, as well as prohibitions on local and special laws and other forms of legislative favoritism.[4]
I have searched the historical record in vain for any suggestion that the abuses of mid-nineteenth-century legislatures also included the enactment of laws that encroached on common-law tort remedies. Smothers certainly identified none. That such is the case, again, is understandable when the historical context is more fully taken into account. The mid-nineteenth century, after all, was no friend to those seeking recovery for injury. The law of negligence was in its infancy. Lawrence Friedman, A History of American Law 222 (3d ed 2005) (in the nineteenth century, “[n]egligence was the merest dot on the law”); Morton J. Horowitz, The Transformation of American Law 1870-1960 85 (1977) (“One is surprised to learn how really late it was in the nineteenth *187 century before the action for negligence became a significant factor in American law.”).[5] The law was dominated by doctrines that favored railroads and industry. Under the prevailing “fellow servant rule” and its cousin, assumption of risk, employees could almost never sue their employers for workplace injuries.[6] Contributory negligence precluded recovery if a plaintiff were at fault in the slightest way. See Lawson v. Hoke, 339 Or 253, 262, 119 P3d 210 (2005) (noting *188 “the indisputable proposition that, in the early years of this state’s history, a plaintiffs contributory negligence was an absolute bar to recovery for the negligent acts of another”). The “spirit of the age,” as Friedman put it, “was a spirit of limits on recover y.” A History of American Law at 352. And those limits on recovery “[a]ll had either been invented or refined by the judges themselves.” Id. at 356.[7]
*189 In that context, I have to wonder where the idea originated that the framers wanted judges to act as restraints on legislative abrogation of common-law remedies. The robust common-law remedies with which we are so familiar today barely existed at the time, and it was the judges who were adopting constraints on them.
The problems with Smothers that I have described do not appear to be mere disagreements about subtle issues of historical interpretation that are of idle academic interest. Recall that the court in Smothers acknowledged an absence of direct evidence of what the Oregon framers intended the remedy clause to mean. The linchpin of its decision was its construction of a settled understanding of what remedy clauses meant to mid-nineteenth-century framers. The court then read the silence of the record as to the particular intentions of the Oregon framers as, in effect, acquiescence in that settled understanding. 332 Or at 114 (“[W]e find no indication that the drafters sought to depart from the historical purpose of remedy clauses.”).
The problem is that the court did not make its case for a settled understanding of state remedy clauses. The matter is, at best, debatable. Indeed, what scholarship on *190 the subject exists suggests an absence of any consensus about what state remedy clauses were intended to mean. See, e.g., Hoffman, 74 Or L Rev at 1281 (“Research published to date reveals little more than that the provision comes from Magna Carta Chapter 40, as viewed through the lens of Sir Edward Coke’s Second Institute.”).[8] And, bearing out that very point, courts in states whose constitutions include remedy guarantees are divided about what the guarantees actually mean. Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses § 6.02 [3] at 6-9 (4th ed 2006) (“[S]tate court decisions divide sharply on the central issue of whether (and how) these clauses do limit legislative attempts to alter remedies available under the common law.”).
Aside from the fact that Smothers appears to rest on a shaky historical foundation, the decision does not appear to be working very well on its own terms, as our recent, sharply divided cases make clear. See, e.g., Howell v. Boyle, 353 Or 359, 298 P3d 1 (2013). This court, in fact, appears to *191 have trouble even identifying — and agreeing about — what Smothers held. In Lawson, for example, the court concluded that, because the plaintiffs negligence claim was subject to various defenses at common law, it was not the sort of “absolute common-law right” that the remedy clause protects. 339 Or at 264-65. The court used the term “absolute” quite differently from the way Smothers used it and, in the process, significantly muddied the waters in this area of the law.
The difficulty is that Smothers explicitly holds that the scope of the remedy clause is limited to protecting common-law rights that vested in 1857. That is problematic in at least several ways.
First, if Smothers constitutionally protects claims that existed in 1857, it would seem to follow that its protection extends to some that can only be regarded as quaint artifacts of a time long gone by. For example, if Smothers means what it says, I do not understand how the legislature had the constitutional authority to eliminate a husband’s common-law liability for the torts of his wife or such claims as the tort of alienation of affection. It should not be forgotten that, at the time of the adoption of the Oregon Constitution, women had limited legal rights, and some persons of color had none at all.
Second, if the remedy clause protects only those claims that “vested” in 1857, that turns out to be not much of a guarantee, given the state of the common law at that time. For example, as this court noted in Howell, at the time of the adoption of the Oregon Constitution, a plaintiff could not state a claim for negligence without affirmatively establishing a complete absence of contributory negligence. 353 Or at 382-85. The doctrine was not treated as a defense in this state until the mid-1880s. See Grant v. Baker, 12 Or 329, 332-33, 7 P 318 (1885) (first decision to treat contributory negligence as an affirmative defense). It would seem to follow that the remedy clause affords no relief to any twenty-first century plaintiff who was at fault in the slightest way.
Third, there is the unavoidable problem of determining the proper level of generality with which to describe *192 and analyze claims that may have existed at common law in 1857. For example, in Lawson, a motorist who was injured in a collision with another motorist argued that a statutory limitation on noneconomic damages when the injured party did not have automobile liability insurance violated her right to a remedy under Article I, section 10, because the statute abrogated claims for negligence, which clearly existed in 1857. The defendant argued that the remedy clause did not apply under Smothers, because claims for injury arising out of automobile accidents were not recognized in the mid-nineteenth century, automobiles not having been invented at the time. The plaintiff rejoined that, although automobiles had not yet been invented, Conestoga wagons had been, and the law would have recognized injuries arising out of such transportation-related accidents. This court ultimately held that neither party was correct and that the key determinant to the question whether the framers would have recognized a claim for the plaintiffs injuries in 1857 was the fact that she had failed to comply with the law that required her to obtain liability insurance. 339 Or at 260. It strikes me that there is no way to determine whether the remedy clause actually applies until this court identifies the proper level of generality with which to describe the nature of the claims that the common law in 1857 would or would not have recognized, and nothing in Smothers or any other case of which I am aware provides a principle of law that enables the bench and bar to predict what that proper level of generality is.
In that regard, it is worth noting that it is plaintiff in this case who suggests that we should depart from the rigid historical focus of Smothers and broaden the guarantee beyond those rights that existed in 1857. That simply will not work, however, at least not without completely rethinking the interpretation of the remedy clause. Smothers cannot just be tweaked as plaintiff suggests. Its very rationale is that certain rights vested at a point in time. 332 Or at 116 (under the remedy clause, “‘[v]ested rights are placed under constitutional protection, and cannot be destroyed by legislation.’” (quoting Templeton v. Linn County, 22 Or 313, 318, 29 P 795 (1892)). It is explicitly historical.[9]
*193 My own view is that it is unlikely that the framers intended the remedy clause to serve as a limitation on legislative authority, certainly not one that essentially freezes the guarantee to preserve mid-nineteenth-century tort law. See generally Brewer v. Dept. of Fish and Wildlife, 167 Or App 173, 191-98, 2 P3d 418 (2000) (Landau, J., concurring). I am inclined to agree with what appears to be the majority of other state courts that have addressed the issue, which conclude that state remedy clauses are addressed to the courts, not the legislature, and that — consistently with mid-nineteenth-century antipathy to favoritism — its target is the accessibility of the courts by all, without discrimination.[10]
*194 But I make no claim that that view reflects anything close to settled law or history. Moreover, that view presupposes that the framers’ intentions are controlling in the first place — a position that, as I have said, I contest. At this point, I am less invested in a particular interpretation of the clause than I am in having the matter served up for proper argument and reexamination.
I have similar reservations about Hughes, especially with respect to its incorporation of Smothers-type analysis into the interpretation and application of the right to a jury trial guaranteed by Article I, section 17, of the Oregon Constitution. At issue in Hughes was the constitutionality of a statutory limit on noneconomic damages in a wrongful death action. The plaintiff argued that the cap, among other things, violated her right to a remedy under Article I, section 10, and her right to a jury trial under Article I, section 17. As to the remedy clause claim, the court diligently applied Smothers and concluded that the remedy clause did not apply to wrongful death claims, because neither the common law nor the Oregon legislature recognized such claims until at least five years after the adoption of the state constitution. 344 Or at 146-52. Turning to the jury clause claim, the court similarly concluded that the plaintiff could not prevail “[b]ecause the common law does not, and did not in 1857, recognize a right to unlimited damages in wrongful death actions.” Id. at 156-57.
Article I, section 17, provides that, “ [i] n all civil cases the right of Trial by Jury shall remain inviolate.” By its terms, it applies to “all civil cases,” not just the limited number of civil cases that would have triggered a right to a jury trial in 1857. And I am aware of no evidence in the *195 historical record that the framers of the provision intended or contemplated that the constitutional guarantee would be so limited.
In fact, our more recent case law rejects just such a reading of Article I, section 17. In Foster v. Miramontes, 352 Or 401, 287 P3d 1045 (2012), we expressly rejected the notion that the right to a jury trial is limited to claims that existed at common law at the time of the framing of the constitution. To the contrary, we held that the guarantee applies to all “claims or requests that are properly categorized as ‘civil’ or ‘at law.’” Id. at 425. Only if a claim, standing alone, is “equitable in nature and would have been tried to a court without a jury at common law,” does the guarantee not apply. Id.
Obviously, there is some tension between what this court said and did in Hughes and what we said and did in Foster.
It strikes me that there are two possible ways to resolve that tension. First, we could conclude that Foster— which did not expressly address the matter — implicitly overruled Hughes. Second, we could conclude that Foster did not need to overrule Hughes, because Hughes and its Smothers-like analysis apply to only a particular aspect of the right to a jury trial, namely, a right to the benefit of the jury’s decision itself without any statutory limitations, and does not apply to the broader question whether there is a right to have the jury make the decision in the first place.
In my own view, only the former possibility is tenable. I do not understand how the right to a jury trial can be parsed out into subsidiary rights, one of which requires Smothers-like historical analysis and the other that does not. Either there is a right to a jury trial, or there is not. Plain and simple.
It could be inferred that the court implicitly adopts the second of the two possibilities in this case, given that it has engaged in the historical analysis that Smothers and Hughes require in deciding the matter under Article I, section 17. I think the inference would be erroneous, however. As the court notes, neither party asks us to overrule Hughes. Moreover, because the court concludes that plaintiffs claims *196 would have been recognized at common law, it simply does not need to address whether such analysis is required. Still, the issue is an important one and deserves to be addressed in an appropriate future case.
I do not argue that we should address all of these issues in this case. Although I would not go so far as to say that we are incapable of reconsidering earlier decisions without a request from one or more parties, I nevertheless recognize that questions such as the ones that I have posed are difficult and complex and that the court, in attempting to address them, would benefit from the sort of research and argument that the adversarial process provides. Careful and vigorous advocacy may reveal that I am mistaken in my critique of Smothers and Hughes. Or not. Either way, before we apply those decisions in future cases, we should invite such advocacy to address the issues that I have raised.

 The closest thing to direct evidence about the intended meaning of Oregon’s remedy clause, the court explained, was the rewording of the clause — without explanation — from the Indiana provision on which it was based. 332 Or at 113-14. Article I, section 12, of the Indiana Constitution provided:
“All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.”
A committee on the Bill of Rights apparently reworked the phrasing so that Article I, section 10, of the Oregon Constitution provides:
“No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.”
The court found significant that the revised version “expressed in a separate, independent clause the guarantee of remedy by due course of law.” 332 Or at 114. Of course, the remedy guarantee was expressed in a separate, independent clause in the original Indiana version, as well. The framers of the Oregon version simply moved the independent clause of the Indiana version to a different place in the sentence.

 As Holdsworth explained, the dispute between Coke and King James I was part of a larger one over the nature of sovereign power in post-Tudor England. The courts “naturally magnified the royal prerogative on which they leaned and to which they owed their authority. They therefore gravitated to the royalist view” of the state. Holdsworth, 5 A History of English Law at 423-24. On the other hand, the medieval common-law view was that “the law was supreme, and the [royal] prerogative was therefore limited by it. The common lawyers therefore gravitated to the parliamentary view that the prerogative was subject to definite legal limitations.” Id. Coke was of the latter, parliamentary, view. Id. In Coke’s view, “the common law was the supreme law in the state, and the judges, unfettered and uncontrolled save by the law itself, were the sole exponents of this supreme law.” Id. at 428. In James I’s view, “the judges were, like other civil servants, the officers of the crown. The crown could therefore supersede them if necessary, and decide any matter for itself.” Id.; see also Catherine Drinker Bowen, The Lion and the Throne: The Life and Times of Sir Edward Coke 294 (1956) (The king’s position — articulated by Lord Chancellor Ellesmere and Archbishop Bancroft, respectively — was “rex est lex loquens,” that is, “the King is the law speaking.” Judges were “lions, but yet lions under the throne, being circumspect that they do not check or oppose any points of sovereignty.”). James I asserted just that authority when, for example, he attempted to interfere with ongoing proceedings in the common-law courts. Holdsworth, 5 A History of English Law at 438-40. Coke was ultimately dismissed from the bench over the controversy. Meanwhile, James I and his successor, Charles I, continued to remove judges who refused to do the bidding of the crown. See generally J. H. Baker, An Introduction to English Legal History 167 (4th ed 2002).

 Reference to the ubi jus maxim dates back at least to the early eighteenth century. The English decision in Ashby v. White, 92 Eng Rep 126 (1703), is often cited as the leading opinion. Blackstone certainly discussed it. Blackstone, 1 Commentaries at *55-56. It was also famously invoked in Marbury v. Madison, 5 US 137, 163 (1803) (“[W]here there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded.”). There has been some suggestion that Ashby has been misunderstood, as a result of an eighteenth century publication mishap, and that the decision actually rejected the principle. See Ted Sampsell-Jones, The Myth of Ashby v. White, 8 U St Thomas LJ 40, 40 (2010).

 As Professor G. Alan Tarr explains in his leading treatise on state constitutions, beginning in the 1830s, state constitution makers imposed restrictions on legislatures, principally to address problems of corruption. G. Alan Tarr, Understanding State Constitutions 118 (1998). The constitutional limitations tended to focus on process, requiring supermajorities, multiple readings, title requirements, single-subject limitations, and the like. Id. at 118-19. Later, in the period from 1840-70, the focus shifted to legislative favoritism, resulting in requirements of equal taxation and bans on special corporation acts, among other things. Id. “Most restrictions,” Tarr explains, “were designed to combat special privilege and the threat of corruption by forbidding legislators from enacting special or local laws in specific areas of public policy.” Id. at 120.

 The first treatise on the subject of torts did not appear until 1859. Francis Hilliard, The Law of Torts or Private Wrongs (1859) (the first printed text on torts). As late as the 1870s, Oliver Wendell Holmes remarked that torts “is not a proper subject for a law book,” as it simply amounted to a collection of unrelated writs. O. W. Holmes, Book Notice, 5 Am L Rev 340, 341 (1871). As Professor G. Edward White noted in his leading treatise on the history of the development of tort law in this country, “[t]he emergence of Torts as an independent branch of law came strikingly late in American legal history.” G. Edward White, Tort Law in America: An Intellectual History 3 (2003). Torts, he explained “was not considered a discrete branch of law until the late nineteenth century.” Id.

 Courts held that risks resulting from a dangerous place of employment were incident to employment and addressed in the worker’s rate of pay. An employee could sue an employer only for the employer’s personal misconduct, which, given the realities of nineteenth-century industrial organization, made that possibility essentially meaningless. See generally Lawrence M. Friedman and Jack Ladinsky, Social Change and the Law of Industrial Accidents, 67 Colum L Rev 50, 53 (1967) (“An employee retained the right to sue the employer for injuries, provided they were caused by the employer’s personal misconduct. But the factory system and corporate ownership of industry made this right virtually meaningless.”).
The law was famously described by Chief Justice Shaw in Farwell v. Boston & W. R. Corp., 45 Mass 49, 59-60 (Mass 1842), in which he explained that “[t]he general rule, resulting from considerations as well of justice as of policy, is, that he who engages in the employment of another for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and in legal presumption, the compensation is adjusted accordingly.” See also Comment, The Creation of a Common Law Rule: The Fellow Servant Rule, 1837-1860, 132 U Pa L Rev 579, 590-95 (1984) (describing Farwell and its rapid adoption by most courts).
Some courts adopted exceptions to the rules barring negligence claims against employers. For example, courts created an exception for employers who supplied faulty tools, see, e.g., Flike v. Boston & A.R. Co., 16 Am Negl Cas 765 (NY 1873) (“The master is liable if his own negligence or want of care produces the injury, and this may be manifested by * * * furnishing improper or unsafe machinery, implements, facilities or materials for the use of the servant.”), and another, known as the “vice-principal exception,” that applied to certain supervisory employees whose responsibilities were such that the courts regarded them as, in effect, the employee, see, e.g., Berea Stone Co. v. Kraft, 31 Ohio St 287, 291-92 (1877) (The fellow servant rule, “has no application where the servant by whose negligent conduct or act the injury is inflicted, sustains the relation of superior in authority to the one receiving the injury.”). But such exceptions did not arise until later, in most cases, years after the adoption of the Oregon Constitution. See generally Peter Karsten, Heart versus Head: Judge-Made Law in Nineteenth-Century America 122-124 (1997) (describing adoption of various exceptions to fellow-servant rule from 1860s to 1880s).

 For that reason, it is especially difficult to understand the court’s application of its new interpretation of the remedy guarantee to the question whether the common law in 1857 recognized negligence claims by employees against employers. The court in Smothers declared that, “in 1857, the common law of Oregon would have recognized that a worker had a cause of action for negligence against his employer for failing to provide a safe workplace.” 332 Or at 131. Yet the court found not a single antebellum case to support that proposition.
That is hardly surprising, given the state of the law at the time. As I mentioned, it was all but impossible to recover against an employer for injuries negligently inflicted in the workplace. How, then, could Smothers conclude that, “in 1857, the common law of Oregon would have recognized that a worker had a cause of action for negligence against his employer for failing to provide a safe workplace”? 332 Or at 131. In brief, the court cited several cases from the 1870s and 1880s that recognized exceptions to the rule of nonliability, without acknowledging the rule itself.
For example, the court relied heavily on an 1880 United States Supreme Court decision, Hough v. Texas and Pacific R.R. Co, 100 US 213, 25 L Ed 612 (1879), which it said recognized a “firmly established” rule that employers were obligated by law to provide a safe workplace. 332 Or at 129-30. A careful reading of Hough, however, reveals a different picture. In that case, the United States Supreme Court expressly recognized “the general rule exempting the common master from liability to one servant for injuries caused by the negligence of a fellow-servant in the same employment.” 100 US at 215. The Court quoted extensively from Chief Justice Shaw’s opinion in Farwell and commented that, “[a]s to the general rule, very little conflict of opinion is to be found in the adjudged cases.” Id. at 216. Indeed, the Court said, “the general doctrine, as stated by Chief Justice Shaw, is sustained by elementary writers of high authority, and by numerous adjudications of the American and English courts.” Id. The Court then went on to note a recently recognized exception to the general rule, that employers were obliged to “provid[e] the servant with machinery or other instrumentalities adequately safe” for use in the workplace. Id. at 217. This is precisely one of the exceptions that I mentioned above, exceptions that were not adopted until the 1860s and 1870s.
In similar fashion, the court in Smothers quoted Anderson v. Bennett, 16 Or 515, 19 P 765 (1888), as holding that “an employer, and the employer’s representatives, have a duty ‘to use reasonable care and diligence and [to] make reasonable provision for the servant’s safety.’” 332 Or at 131 (quoting Anderson, 16 Or at 532). The court conceded that Anderson was decided more than 30 years after the adoption of the constitution, but it regarded the decision as controlling nonetheless, because “nothing in the court’s opinion in that case suggested that the holding was novel or that the decision marked a departure from any previous decisions or jurisprudence on the subject.” 332 Or at 131. That appears to be incorrect.
The court in Anderson actually began its analysis by acknowledging the general rule and rationale from Shaw’s Farwell decision: “The general doctrine that a master is not liable for the injuries caused by the negligence of a fellow-servant *189 engaged in the same common employment is now regarded as part of the common law of this land.” 16 Or at 520. But, after acknowledging the general rule, the court explained that more recent decisions have retreated from that harsh rule in the interests of justice:
“But in the progress of society since the decision in Farwell v. Railroad Co. such has been the increase in the number and magnitude of the business operations of the country, the great army of servants required to be employed to perform their work, and the necessity of placing over them, and in charge of these vast operations, other servants to direct and control their labor, that there has been wrought in the judicial mind the conviction that the general application of that rule in such cases has often worked manifest injustice and hardship. So that the later current of judicial decision *** indicates a marked departure from that rule, and a disposition to so limit and restrict it as shall make the master answerable for his just share of responsibility to his servant for injuries sustained in his employment.”
16 Or at 522 (emphasis added). In that context, the court then recognized the development of the vice-principal exception to the fellow-servant rule and the obligation of the employer to furnish a safe place of employment. Id. at 528.
Thus, in both cases, it appears that Smothers failed to acknowledge what the authorities it cited actually said about the general rule of nonliability of employers and instead quoted from what those authorities identified as exceptions to that general rule — exceptions that were not widely recognized until after the adoption of the Oregon Constitution.

 There is little in the way of scholarship about the historical origins of remedy clauses. But, even within that small universe of scholarship, there is much disagreement. A number of authors take the position that the clauses were intended only to secure an independent, accessible judiciary. See, e.g., Nicholson, A Sense of the Oregon Constitution at 194 (Article I, section 10, was intended “to provide every person with access to the courts to resolve private disputes, but does not guarantee a recovery or require that any particular rules of law shall apply.”); Hoffman, 74 Or at 1318 (“Modem cases and commentaries interpreting this clause * ** * to forbid legislatures from modifying or eliminating existing remedies through duly enacted legislation!] are simply not consistent with the original purpose of the clause.”); Daniel W. Halston, The Meaning of the Massachusetts “Open Courts” Clause and Its Relevance to the Current Court Crisis, 88 n 3 Mass L Rev 122, 130 (2004) (“there is ample evidence that the clause, once placed in historical context, was actually intended to create and protect an independent judiciary”); Phillips, The Constitutional Right to a Remedy, 78 NYU L Rev at 1309 (same). Others suggest — in my view, without much in the way of explanation — that the clauses were intended to limit legislative authority. See, e.g., Comment, The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy, 47 U Kan L Rev 655, 659 (1999) (the use of remedy clauses “to curtail legislative power remains true to the historical spirit of the provision as a means of preserving the common law”); William C. Koch, Jr., Reopening Tennessee’s Open Courts Clause: A Historical Reconsideration of Article I, section 17 of the Tennessee Constitution, 27 U Mem L Rev 333, 450 (state remedy clause limits legislative authority to abolish common-law remedies). Still others take a sort of middle position. Schuman, 65 Temple L Rev at 1224-25. And still others suggest that there may be a constitutional right to a remedy, but only under a state or federal due process clause. See, e.g., Tracy A. Thomas, Restriction of Tort Remedies and the Constraints of Due Process: The Right to an Adequate Remedy, 39 Akron L Rev 975 (2006).

 That is not based on a stray or incidental quote from the court’s opinion. In Smothers the court stated nearly a dozen times that the drafters “sought to *193 give constitutional protection to absolute rights respecting person, property, and reputation as those rights were understood in 1857," 332 Or at 115 (emphasis added), or similar phrasing. See also, e.g., id. at 116 (“the purpose of the remedy clause ‘is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution.’” (quoting Stewart v. Houk et al., 127 Or 589, 591, 271 P 998 (1928)); id. at 118 (“As we have explained, the history of the remedy clause indicates that its purpose is to protect absolute common-law rights respecting person, property, and reputation as those rights existed when the Oregon Constitution was drafted in 1857.”); id. at 123 (“Article I, section 10, protects rights respecting person, property, and reputation that, in 1857, the common law regarded as ‘absolute.’”); id. at 124 (remedy clause preserves claims for “injury,” defined as “a wrong or harm for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857”). It was, in fact, explicitly the basis for this court’s holding in prior cases that certain modem claims are not subject to the remedy guarantee of Article I, section 10. See Hughes, 344 Or at 151-52 (remedy clause does not apply to claims for wrongful death, because such claims were not recognized at the time of the adoption of the Oregon Constitution).

 See, e.g., O’Quinn v. Walt Disney Productions., Inc., 177 Colo 190, 195, 493 P2d 344 (Colo 1972) (remedy clause “simply provides that if a right does accrue under the law, the courts will be available to effectuate such right”); Hawley v. Green, 117 Idaho 498, 500-01, 788 P2d 1321 (Idaho 1990) (remedy clause “merely admonishes the Idaho courts to dispense justice and to secure citizens the rights and remedies afforded by the legislature or by the common law”); Smith v. Indiana Dept. of Correction, 883 NE 2d 802, 808 (Ind 2008) (“the Open Courts Clause does not prevent the legislature from modifying or restricting common law rights and remedies”); Crier v. Whitecloud, 496 So 2d 305, 309-10 (La 1986) (“From this history [of the state open courts clause] we conclude that *** the Constitutional Convention did not intend to limit the legislature’s ability to restrict causes of action or to bar the legislature from creating various areas of statutory immunity from suit. * * * The constitutional guarantee providing for open courts and insuring a remedy for injuries does not warrant a remedy for every single injury.”); Meech v. Hillhaven West, Inc., 238 Mont 21, 30, 776 P2d 488, 493 (Mont 1989) (“The history of the guarantee indicates that framers of state constitutions inserted remedy clauses to insure equal administration of justice. Clauses insuring equal administration of justice are aimed at the judiciary, not the legislature.”); Lamb v. Wedgewood South Corp., 308 NC 419, 444, 302 SE2d 868 (NC 1983) (“the remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally *194 cognizable and those under which it is not.”); Andrews v. O’Hearn, 387 NW2d 716, 723 (ND 1986) (“[o]ur research shows that [the open courts clause of the state constitution] has been repeatedly construed as a guarantee of access to our State system of justice”); Singer v. Sheppard, 464 Pa 387, 400, 346 A2d 897 (1975) (“nothing in [the state constitution] prevents the legislature from extinguishing a cause of action”); Nash v. Baker, 522 P2d 1335, 1338 (Okl App 1974) (state open courts clause “does not promise a remedy to every complainant[;] * * * [i]t does not prevent the Legislature from creating new legal rights *** or from increasing or reducing or changing the scope of such a right or the remedy for its violation”); Quesnel v. Town of Middlebury, 167 Vt 252, 258, 706 A2d 436, 439 (1997) (state open courts clause “does not create substantive rights[,] *** it merely provides access to the courts”).