FILED

02/27/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 25-0858

OP 25-0858

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 39

THERESA KENDRICK, CLAUDIA
CLIFFORD, and MONTANANS DECIDE,

      Petitioners,

    v.

AUSTIN MILES KNUDSEN, in his official
capacity as MONTANA ATTORNEY GENERAL,

      Respondent.

ORIGINAL PROCEEDING:    Petition for Declaratory Judgment

COUNSEL OF RECORD:

    For Petitioners:

        Raph Graybill, Rachel Parker, Graybill Law Firm, PC, Great Falls, Montana

    For Respondent:

        Austin Knudsen, Montana Attorney General, Michael D. Russell, George Carlo L. Clark, Assistant Attorneys General, Helena, Montana

    For Amicus Curiae Campaign Legal Center:

        Constance Van Kley, Van Kley Law PLLC, Missoula, Montana

    For Amici Curiae Montana Federation of Public Employees, Service Employees International Union Local 775, Montana Conservation Voters, Wild Montana, Montana Public Interest Research Group, Catalyst MT, and American Civil Liberties Union of Montana:

        James H. Goetz, Jeffrey J. Tierney, Cameron T. Clevidence, Goetz, Geddes & Gardner, P.C., Bozeman, Montana

Nate McConnell, McConnell Law Offices, PLLC, Missoula, Montana

For Amici Curiae Missouri Voter Protection Coalition, League of Women Voters of Ohio, and Florida Decides Healthcare:

Caitlin Boland Aarab, Boland Aarab PLLP, Great Falls, Montana

Decided: February 27, 2026

Filed:

_____
Clerk

2

Justice Katherine Bidegaray delivered the Opinion and Order of the Court.

¶1 Petitioners Theresa Kendrick, Claudia Clifford, and Montanans Decide (collectively "Proponents") seek review under § 13-27-605(5), MCA, of the Attorney General's determination that Ballot Issue 8 ("BI-8") is legally insufficient because it violates Article XIV, Section 11, of the Montana Constitution. Proponents request that we reverse the legal-sufficiency determination and direct the Attorney General to prepare and forward ballot statements to the Secretary of State within five days. Proponents also challenge the Attorney General's decision to append a fiscal statement to BI-8, asserting the fiscal note does not indicate a fiscal impact. With leave of Court, amici Campaign Legal Center, Montana Federation of Public Employees, et al., and Missouri Voter Protection Coalition, et al., filed briefs in support of Proponents.

¶2 Section 3-2-202(3)(a), MCA, provides this Court original jurisdiction to review the Attorney General's legal-sufficiency determination. We accept original jurisdiction. We conclude BI-8 constitutes a single constitutional amendment under Article XIV, Section 11, and the Attorney General lacked statutory authority to append a fiscal statement. The petition is granted.

¶3 We address the following issues:

1. *Whether BI-8 violates the separate vote requirement of Article XIV, Section 11, of the Montana Constitution.*

2. *Whether the Attorney General had authority to append a fiscal statement to BI-8.*

¶4 BI-8 would amend Article II of the Montana Constitution by adding a new Section 37 recognizing a fundamental right to exercise the powers of initiative and

3

referendum and limiting the government's ability to deny or burden those rights.

BI-8 proposes the following language:

> **Section 37. Right to initiative and referendum.** (1) The people have a fundamental right to exercise their powers of initiative and referendum under Article III and Article XIV. The government may not deny or burden this right unless justified by a compelling government interest achieved by the least restrictive means.
>
> (2) This right guarantees impartial, predictable, transparent, and expeditious processes for proposing a ballot issue, qualifying a ballot issue for the ballot, and submitting a ballot issue to the qualified electors without interference from the government or the use of government resources to support or oppose the ballot issue. This right includes but is not limited to:
>
>> (a) proposing a ballot issue by submitting the full text of the ballot issue and proposed ballot statements, with the government modifying the proposed ballot statements only if they are not a true and impartial explanation expressed in plain, easily understood language;
>>
>> (b) obtaining a determination regarding whether the ballot issue and ballot statements are legally sufficient for submission to the qualified electors prior to the petition being approved for circulation;
>>
>> (c) the resolution of legal challenges to the determination made in subsection (2)(b) and the issuance of an approved petition for circulation within 90 days of the initial submission of the ballot issue to the government;
>>
>> (d) reasonably ample time to gather signatures without unjustified burdens on signature gathering, on signature gatherers, or in the preparation or submission of signed petitions;
>>
>> (e) verification of signatures and petitions without the invalidation of a signature or petition due to a technical or minor deficiency;

(f) the ability to withdraw one's signature from a petition, with the deadline for a withdrawal being the same as the deadline for submitting signed petitions to the government;

(g) the resolution of legal challenges to the qualification of a ballot issue for the ballot prior to the deadline for finalizing ballots for the election; and

(h) submission of a ballot issue to the qualified electors in an impartial manner for their approval or rejection by a majority of those voting thereon at a single election.

**Section 2. Self-executing.** [This act] is self-executing.

**Section 3. Effective date.** [This act] is effective on approval by the electorate.

¶5 *1. Whether BI-8 violates the separate vote requirement of Article XIV, Section 11, of the Montana Constitution.*

**Legal Standard**

¶6 Article XIV, Section 11, provides, "If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately." The provision serves two purposes: to prevent voter confusion and to prevent logrolling—"combining unrelated amendments into a single measure which might not otherwise command majority support." *Mont. Ass'n of Counties v. State*, 2017 MT 267, ¶ 15, 389 Mont. 183, 404 P.3d 733 ("*MACo*"). At the same time, we must apply the rule "in a manner that does not encumber the right of the people to amend the Constitution." *MACo*, ¶ 25. Courts therefore enforce Article XIV, Section 11, faithfully but not expansively. The constitutional question is whether the proposal effects two or more substantive amendments that are not closely related, *MACo*, ¶¶ 29-30, not whether it could have been drafted differently.

5

¶7 It is within the Attorney General's authority to determine whether a proposed ballot issue complies with the separate-vote provision of Article XIV, Section 11, of the Montana Constitution. *Monforton v. Knudsen*, 2023 MT 179, ¶ 11, 413 Mont. 367, 539 P.3d 1078. Exercising that authority, the Attorney General contends BI-8 violates the separate-vote requirement because it effects multiple constitutional changes. Specifically, he asserts BI-8: (1) imposes date-certain deadlines for adjudication of claims that conflict with the judicial power and current constitutional treatment of pre-election challenges; (2) prohibits "interference from the government or the use of government resources to support or oppose the ballot issue," thereby conflicting with the existing authority of public officials to speak officially on ballot measures affecting their duties; (3) imposes "statute-like criteria dictating the procedural submission of ballot issues," which he argues conflicts with the existing constitutional structure; and (4) creates a new fundamental right.

¶8 The Attorney General further maintains that these changes are not closely related. He argues the government-resource prohibition is unrelated to the procedural protections BI-8 establishes and that the Constitution separately addresses the initiative power, judicial priority for pre-election disputes, and legislative authority to administer elections. In his view, BI-8 impermissibly "rolls these issues together."

¶9 Proponents respond that BI-8 is a single, comprehensive proposal that establishes and safeguards one fundamental right—the people's exercise of initiative and referendum—and that its provisions operate together to make the ballot initiative process timelier, more predictable, and less susceptible to governmental interference.

**BI-8 and *MACo*'s "Closely Related" Inquiry**

¶10    We begin by asking whether BI-8 would make two or more changes to the Montana Constitution that are substantive and not closely related.  If a proposed constitutional amendment adds new matter to the Constitution, that proposition constitutes at least one change.  If the proposal has the effect of modifying an existing constitutional provision— expressly or implicitly—it constitutes an additional change.  *MACo*, ¶ 28.

¶11    BI-8 recognizes a fundamental right to exercise the powers of initiative and referendum and enumerates components of that right, including procedural guarantees for proposing, qualifying, and submitting ballot issues.  The creation of this new constitutional provision constitutes one amendment.  The question is whether the remaining provisions amount to additional, separate amendments that are not closely related.  They do not.

¶12    In *Montanans for Nonpartisan Cts. v. Knudsen*, 2025 MT 268, 425 Mont. 51, 579 P.3d 536 ("*MNC*"), we held that a proposal containing two distinct constitutional subjects—maintaining nonpartisan judicial elections and requiring that newly created courts have elected judges—violated Article XIV, Section 11.  Although the initiative advanced a broad policy objective, its components addressed separate constitutional questions on which voters were entitled to cast separate votes.  *MNC*, ¶¶ 10, 15.

¶13    We applied the same framework in *Transparent Election Initiative v. Knudsen*, 2026 MT 2, __ Mont. __, 581 P.3d 1285 ("*TEI*").  There, the proposal would have both eliminated corporate political spending and broadly altered the constitutional status of "artificial persons."  We concluded that, even if the provisions were thematically related, the measure required voters to accept sweeping constitutional changes beyond its stated

7

objective.  *TEI*, ¶¶ 11, 14.  *TEI* did not modify *MACo*.  The governing inquiry remains whether a proposal would make two or more substantive constitutional changes that are not closely related.  A singular purpose does not save a proposal that combines distinct constitutional revisions; but neither does the theoretical ability to subdivide a measure establish a violation.

¶14    Here, the Attorney General identifies the creation of a new fundamental right as one change.  The dispute concerns whether the provisions defining and safeguarding that right constitute additional, separate amendments.   Unlike the initiatives in *MNC* and *TEI*, BI-8 does not combine independent constitutional subjects.  Its provisions operate together to define and protect a single constitutional right—the people's exercise of initiative and referendum.  They are closely related components of one constitutional design.

**Judicial Power and Separation-of-Powers Concerns**

¶15    The Attorney General argues that BI-8 implicitly amends Article VII, Section 1, by imposing timelines for resolving certain initiative-related disputes.  Specifically, he contends that Sections 2(c) and 2(g), which require resolution of certain legal challenges within defined timeframes, intrude upon the judiciary's inherent authority to control its docket and therefore constitute a separate constitutional amendment.  We disagree.

¶16    Article VII, Section 1, provides that "[t]he judicial power of the state is vested in one supreme court, district courts, justice courts, and such other courts as may be provided by law."  BI-8 does not alter that vesting of judicial authority.  It does not divest courts of jurisdiction, transfer adjudicative power to another branch, or reassign any core judicial function.  The timing provisions identified by the Attorney General do not redefine what

8

cases courts may hear or who may decide them; rather, they establish procedural parameters governing the resolution of initiative-related disputes. The judicial power remains vested in the courts.

¶17 The Constitution itself frequently shapes the manner in which courts exercise their authority. Article IV, Section 7(2), requires courts to give priority to preelection challenges. Other constitutional provisions prescribe standards of review or procedural constraints that courts must apply.[1] These directives operate within the judicial power; they do not amend it. Constitutional provisions may define the framework within which judicial authority is exercised without effecting a structural reallocation of that authority.

¶18 BI-8's timing provisions function similarly. Whether those provisions would raise interpretive or separation-of-powers questions if adopted is not the inquiry before us. Under Article XIV, Section 11, the question is whether BI-8 effects multiple substantive constitutional amendments that are not closely related. The existence of procedural timelines does not transform BI-8 into a separate amendment of Article VII.

¶19 In *Montanans Securing Reprod. Rights v. Knudsen*, 2024 MT 54, 415 Mont. 416, 545 P.3d 45 ("*MSRR*"), we rejected the argument that creating an explicit constitutional right necessarily amends other provisions that also protect related interests. "That the rights and protections guaranteed by one provision of the Constitution may also be found in other provisions is well-established." *MSRR*, ¶ 13. The same principle applies here.

---

[1] Article II, Section 10 (Right to Privacy), prescribes a specific standard of judicial review and Article III, Section 4(3) (Initiative), imposes a procedural constraint by creating an absolute bar on judicial inquiry into a petition's sufficiency after an election.

As in *MSRR*, where the Attorney General attempted to isolate a regulatory limitation from the right itself as a separate amendment, the provisions of BI-8 operate together to define and safeguard a single constitutional right. Interaction with the judicial branch—whether through standards, priorities, or procedural guardrails—is not synonymous with alteration of the judicial power.

¶20     The proposed timelines may affect how courts adjudicate initiative-related disputes, but their inclusion in the proposed amendment does not transform the proposal into an amendment of Article II, Sections 16 or 17. In his dissent, Chief Justice Swanson contends that BI-8 amends those provisions by establishing uniform timelines that may affect judicial power and future litigants opposing a ballot measure. But the separate-vote inquiry focuses on whether a proposal presents distinct constitutional subjects requiring separate voter approval. Constitutional amendments frequently establish procedural parameters that operate within the broader framework of judicial administration and litigant rights. That such provisions may interact with existing guarantees of access to courts or due process does not mean they constitute separate constitutional subjects. To hold otherwise would mean that any constitutional amendment affecting adjudicative procedures necessarily amends every related constitutional protection, an approach we have declined to adopt. The timing provisions are components of the proposed initiative right and do not establish a freestanding constitutional regime governing access to courts or due process independent of that right. The judicial-power argument therefore does not establish that BI-8 effects a separate constitutional amendment under Article XIV, Section 11.

**Limits of Pre-Election Legal-Sufficiency Review**

¶21 Several of the Attorney General's arguments address not whether BI-8 violates Article XIV, Section 11, but whether BI-8, if adopted, might withstand post-election constitutional scrutiny. He relies on *Coate v. Omholt*, 203 Mont. 488, 662 P.2d 591 (1983), where this Court invalidated statutory deadlines imposed by the Legislature on the judiciary as violating separation of powers. But again, whatever the merits of potential separation-of-powers arguments after adoption, that is not the inquiry before us. Under § 13-27-226, MCA, the Attorney General's authority at this stage is limited to determining whether a proposed measure complies with the separate vote requirement. *See Monforton*, ¶ 11. Questions regarding how BI-8 might be interpreted or applied in future litigation fall outside that limited review. *See MSRR*, ¶ 15 (citing *Monforton*, ¶ 6); *see also MSRR*, ¶ 24 ("If [the proposed ballot initiative] is adopted, questions may arise as to its interpretation, but this is true of the entire text of the Montana Constitution and its subsequent amendments, and processes exist to resolve those questions accordingly."). Because Article XIV, Section 11, does not authorize pre-election resolution of speculative post-adoption constitutional challenges, the Attorney General's reliance on such concerns does not establish that BI-8 effects a separate constitutional amendment.

**Government Resources and the Integrity of the Initiative Process**

¶22 The Attorney General argues that BI-8's restriction on "the use of government resources to support or oppose the ballot issue" is a separate constitutional subject and contends it conflicts with the existing authority of public officials to speak on ballot measures affecting their duties. We disagree.

11

¶23 The government-resource limitation does not operate independently from the right BI-8 establishes. BI-8 would recognize a fundamental right to exercise the powers of initiative and referendum. Its prohibition on the institutional use of government resources would function as a limitation on governmental interference with that right. The provision does not purport to regulate the private speech of public officials; it addresses the institutional use of governmental resources in a process constitutionally reserved to the people. Again, any alleged conflict with other constitutional rights would be raised as a substantive challenge post-election. As proposed, the provision establishes a limitation against governmental interference with the right BI-8 would establish, not an independent constitutional revision. It is not a separate substantive amendment that is not "closely related" to the provision BI-8 would add to the constitution. *MACo*, ¶¶ 29-30.

¶24 The government-resource provision is located within and framed as part of the guarantee of the right to exercise initiative and referendum and is framed as a protection against governmental interference with that right. It does not establish a freestanding campaign-finance regime or regulate the general conduct of elections. Rather, it delineates one of the structural protections accompanying the constitutional right the proponents want recognized.

¶25 The separate-vote requirement is concerned with whether a proposal combines distinct constitutional subjects such that voters must trade one constitutional change for another. That concern is not present here. A voter who supports additional constitutional protections of the people's initiative power is not compelled to accept an unrelated

12

constitutional revision. The government-resource limitation defines one of the protections of the right itself.

¶26 To treat this provision as a separate amendment would substantially expand the implied-effects doctrine beyond its constitutional purpose. Justice Rice's dissent characterizes the government-resource limitation as an express additional constitutional change rather than an implied effect. But Article XIV, Section 11, does not hinge on whether a provision is express or implied. The inquiry is whether the proposal presents distinct constitutional subjects requiring separate votes. Under that approach, any provision included to implement a proposed new constitutional right could then be recharacterized as a second amendment merely because it constrains governmental actors. Article XIV, Section 11, does not require constitutional proposals to be reduced to their smallest conceivable components. And the provision does not purport to restrict the right of public officials to express personal views.

¶27 Article XIV, Section 11, prohibits only the bundling of unrelated constitutional changes that forces voters to trade one amendment for another. Here, the government-resource limitation is part of the structural design of the proposal. Review of a proposed ballot issue for legal sufficiency may not be based on how the provisions will be interpreted and applied or anticipate a question of constitutional law that may arise if the measure is passed. *See MSRR*, ¶ 15.

¶28 The Attorney General cites various constitutional provisions—Article V, Section 1; Article VI, Section 4; Article X, Section 9; and Article XIII, Section 4, of the Montana Constitution—describing the powers and duties of public officials. But those citations do

13

not establish that BI-8 effects a separate constitutional amendment for Article XIV, Section 11, purposes. The Article XIV inquiry is narrower: whether BI-8 effects two or more substantive constitutional amendments that are not closely related. *See MSRR*, ¶ 15 (citing *Monforton*, ¶ 12).

¶29 As in *MSRR*, where we rejected the argument that a constitutional provision regulating abortion after viability constituted a separate amendment from the right itself, the provisions of BI-8 operate together to establish and safeguard a single constitutional right. They are qualitatively similar in effect and closely related in purpose. They do not present separate constitutional subjects requiring separate votes.

¶30 In *Montanans for Election Reform Action Fund v. Knudsen*, 2023 MT 226, ¶ 19, 414 Mont. 135, 545 P.3d 618 ("*MERAF*"), the Attorney General determined the proposed ballot initiative, which would have created a top-four primary election for certain offices, implicitly amended Article IV, Section 3, of the Montana Constitution because it would have restrained the Legislature's ability to regulate primary elections. We rejected that assertion, explaining, "Article IV, Section 3, grants the Legislature the authority to 'provide by law the requirements,' and [the proposed initiative] would not affect the Legislature's authority to 'provide by law.'" *MERAF*, ¶ 19. At issue here, Article VI, Section 4, and Article X, Section 9, of the Montana Constitution, specify the duties of particular officeholders are as "provided by law." BI-8 would not affect those officeholders' authority to perform their duties as "provided by law."

¶31 Moreover, as noted above, questions as to future interpretations of BI-8, if adopted, go beyond the scope of authority for pre-election legal sufficiency review that § 13-27-226,

14

MCA, grants the Attorney General. *MSRR*, ¶ 15. In his concurring Opinion in *Cottonwood Envtl. Law Ctr. v. Knudsen*, 2022 MT 49, ¶ 28, 408 Mont. 57, 505 P.3d 837, Chief Justice McGrath explained that the Attorney General "lacks the power to reject a proposed ballot initiative based on an opinion about its constitutionality. Under our constitutional structure and separation of powers, only the courts may make determinations about a law's constitutionality." How the provision may be applied or interpreted thus does not provide a basis for the Attorney General to find BI-8 legally insufficient.

**Legislative Authority and the "Statute-Like Criteria" Argument**

¶32 Finally, the Attorney General finds BI-8 legally insufficient because he determined the proposed ballot issue imposes "statute-like criteria dictating the procedural submission of ballot issues," which conflicts with the existing structure and injects significant confusion. In his brief in opposition to the petition, the Attorney General makes substantively the same argument we rejected in *MERAF*. Noting that Article IV, Section 3, of the Montana Constitution gives the Legislature the authority to "provide by law the requirements for . . . administration of elections," the Attorney General asserts this authority "abuts the power of initiative and referendum" and includes a "statutory framework [that] outlines issue submission, pre-circulation review, signature gathering, legal challenges, and forms for appearance on the ballot." The Attorney General argues that, by creating procedural safeguards, BI-8 implicitly amends Article IV, Section 3, because it removes some of the Legislature's power to legislate.

¶33 We rejected a materially similar argument in *MERAF*. There, we held that establishing a new constitutional election structure did not amend Article IV, Section 3,

15

merely because the Legislature would administer it. *MERAF*, ¶ 17. In that case, the proposed ballot initiative would have created a new primary system that the Legislature would have then administered, but the proposed ballot initiative would not have affected the Legislature's ability to do so. *MERAF*, ¶¶ 18-19. In the present case, Proponents argue BI-8 functions no differently than *MERAF*'s proposed ballot initiative in this respect: "the Legislature might change certain election-related laws to comply with BI-8 if it passes, but the provision would have no effect on the Legislature's power to do so."

¶34 We agree with Proponents. BI-8 does not strip the Legislature of its authority to provide by law for election administration under Article IV, Section 3, of the Montana Constitution. It establishes constitutional standards that legislation must respect. That is the ordinary operation of constitutional law. Constitutional rights frequently constrain legislative action. The existence of such constraints does not create a second constitutional amendment. It is the natural effect of constitutional change. Article IV, Section 7, of the Montana Constitution, adopted by voters in 1990, contains separate subsections, part of which include provisions for its implementation by the courts, the Secretary of State, and the Legislature. These provisions were submitted as a single amendment.

¶35 Applying the *MACo* factors confirms that BI-8 is a single amendment. Each provision addresses the exercise and protection of the initiative and referendum power. And each provision is closely related to that stated protection. BI-8 adds one new section to Article II. The initiative process has historically been treated as an integrated subject by both the Constitution and the Legislature. The provisions collectively define and safeguard one fundamental right.

¶36    The Attorney General's analysis relies primarily on hypothetical subdivisions and possible constitutional interactions. But the separate vote rule is not triggered whenever an amendment correlates with other provisions of the Constitution. Nearly every constitutional amendment affects existing provisions. The implied-effects doctrine cannot be extended so far that any structural interaction becomes a separate amendment. To do so would transform Article XIV, Section 11, from a guard against logrolling into a broad veto power over comprehensive reform. The Constitution does not support that result.

**Conclusion on Separate Vote**

¶37    BI-8 presents a single constitutional amendment under Article XIV, Section 11. Although it would create a new fundamental right and defines the procedures to protect and implement its exercise, those provisions are closely related components of one constitutional design. BI-8 does not combine distinct, unrelated constitutional subjects in a manner that forces voters to trade one amendment for another. The Attorney General's determination that BI-8 violates the separate-vote requirement is therefore reversed.

¶38    *2. Whether the Attorney General had authority to append a fiscal statement to BI-8.*

**Legal Standard**

¶39    Section 13-27-226(4), MCA, authorizes the Attorney General to append a fiscal statement "[i]f the fiscal note indicates a fiscal impact."

**Application**

¶40    The fiscal note prepared by the Office of Budget and Program Planning reflects zero fiscal impact across all listed funds and categories. The narrative portion includes a statement that the Secretary of State "assumes" potential litigation costs. Under

17

§ 13-27-226(4), MCA, the budget director prepares the fiscal note. The statute directs the Attorney General to prepare a fiscal statement "*if* the fiscal note indicates a fiscal impact." Section 13-27-226(4), MCA (emphasis added). As in *MSRR*, ¶¶ 26-32, a speculative assumption of potential future litigation does not constitute a determinable fiscal impact within the meaning of § 13-27-226(4), MCA. Because the fiscal note did not indicate a fiscal impact, the Attorney General lacked statutory authority to append a fiscal statement.

**Conclusion on Fiscal Statement**

¶41 Because the fiscal note did not indicate a fiscal impact, the appended fiscal statement is invalid.

¶42 IT IS ORDERED that the petition for declaratory relief on original jurisdiction is GRANTED and the Attorney General's legal-sufficiency determination is reversed.

¶43 IT IS FURTHER ORDERED that the fiscal statement appended to BI-8 is stricken.

¶44 IT IS FURTHER ORDERED that the Attorney General shall prepare ballot statements consistent with the applicable statutory requirements and forward the statements to the Montana Secretary of State within five days of this Opinion and Order.

The Clerk is directed to send a copy of this Opinion and Order to all counsel of record in this matter.

DATED this 27th day of February, 2026.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

18

Justice Jim Rice, dissenting.

¶45   I generally agree with the Court's analysis of the governing law, particularly, the care it has taken to cabin or not further expand the implied-effects doctrine rooted in *Mont. Ass'n of Counties v. State*, 2017 MT 267, 389 Mont. 183, 404 P.3d 733 (*MACo*),[1] and also agree with the distinction the Court makes between potential substantive legal problems with BI-8 and the narrow issue appropriately before us today about whether BI-8 complies with the separate vote requirement of Article XIV, Section 11, of the Montana Constitution ("If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately."). Thus, I agree with the Court's decision to reject the portions of the Attorney General's legal sufficiency determination discussed in the Opinion and Order's sections addressing judicial power, separation of powers, legislative authority, and statute-like criteria. *See* Opinion and Order, ¶¶ 15-20, 32-36. With regard to those issues, I believe the ten paragraphs of BI-8 are closely-related provisions that would further the unified purpose of guaranteeing "expeditious processes for proposing a ballot issue, qualifying a ballot issue for the ballot, and submitting a ballot issue to the qualified electors[,]" and which, therefore, satisfy the single-vote requirement. BI-8, Section 37(2). However, I must disagree that the language in BI-8 placing a new restriction upon the exertion of government influence or the use of government resources

---

[1] While I would be open to considering whether the implied-effects analysis of *MACo* should be revisited, I believe this case can be resolved without doing so. *See* Brief of Amicus Curiae Campaign Legal Center, p. 22 ("As separate-vote challenges are now made to nearly every proposed constitutional amendment, the consequences of the implied effects test are impossible to ignore.").

19

"to support or oppose the ballot issue"—a restriction that even Proponents agree would necessarily extend beyond the new ballot issue approval procedure and include the subsequent electioneering process—is likewise closely related. BI-8, Section 37(2). In my view, this restriction upon the involvement by the government, including upon election campaigning, changes current law and is an altogether different issue that requires a separate vote under Article XIV, Section 11, of the Montana Constitution.

¶46 Notable to me, the Proponents' briefing against the Attorney General's determination on this issue does not dispute that BI-8 does this additional thing, but rather argues that voters would necessarily want to do both things, which is essentially a practical or policy contention that is irrelevant to our inquiry:

> [I]t is hard to conceive of voters desiring to establish the initiative and referendum powers as a fundamental right that may not be unjustifiably denied or burdened by the government, but *also desiring to permit the government to use taxpayer-funded resources to influence the outcome of ballot issue elections*.

Petition for Declaratory Relief on Original Jurisdiction, p. 15 (emphasis added). Whether or not voters would indeed also want to restrict the power of government "to influence the outcome of ballot issue elections," the critical concern for purposes of our inquiry is that such a restriction upon the government is included within BI-8 and is an altogether different concept than the adoption of an expeditious ballot issue approval process. *See* Petition for Declaratory Relief on Original Jurisdiction, p. 15. It thus requires a separate vote.

¶47 As the Attorney General argues, under current law, public officials are authorized, in compliance with statute, to support or oppose ballot initiatives, and we should assume that the Legislature thus believed that officials perform a valuable public service by

20

advising the public of their positions on such issues. In *Sheehy v. Comm'r of Political Practices for Mont.*, 2020 MT 37, 399 Mont. 26, 458 P.3d 309, we rejected the contention that Regent Martha Sheehy had violated the Ethics Code[2] by making statements in support of the statewide 6-Mill Levy that was on the ballot for financial support of Montana higher education, reasoning:

> Regent Sheehy's statements were authorized by law as they were inherently part of her constitutional and statutory duties as a Board of Regents member. Implied in the Board of Regents' broad powers to "supervise, coordinate, manage, and control the [MUS]," is the power to do all things necessary and proper to the exercise of its general powers which would necessarily include support of a major financing source for the MUS. . . . Accordingly, supporting and discussing the 6-Mill Levy, a major financing source for the MUS, is inherently an action authorized by law and properly incidental to Regent Sheehy's duties.

*Sheehy*, ¶ 29. BI-8 proposes to restrict the government from "support[ing] or oppos[ing] the ballot issue," and thus will alter current law governing the role of public officials regarding these elections. Again, this is something unrelated to BI-8's new ballot issue approval procedure.

¶48 The Court's analysis on this point is unavailing. It first proposes that approving the Attorney General's argument on this issue "would substantially expand the implied-effects doctrine." Opinion and Order, ¶ 26. However, the new restriction upon the government is not an implied effect, but rather a prohibition set forth expressly in the text of BI-8. An implied-effects analysis is not required—this is an additional express change. The Court

---

[2] The Ethics Code provided that a public employee may not use "public time, facilities, equipment, supplies, personnel, or funds to solicit support for or opposition to . . . the passage of a ballot issue *unless* the use is: (i) authorized by law; or (ii) properly incidental to another activity required or authorized by law . . . ." Section 2-2-121(3)(a), MCA (emphasis added). *See Sheehy*, ¶ 28.

reasons that the Attorney General's argument would mean that "[a]ny provision included to implement a proposed new constitutional right could then be recharacterized as a second amendment merely because it constrains governmental actors." Opinion and Order, ¶ 26. But again, no recharacterization is necessary here—BI-8 contains language in its text that *expressly constrains* government actors, which cannot be swept away by labeling it as a mere recharacterization of other language. Then, the Court reasons that the provision "does not purport to restrict the right of public officials to express personal views." Opinion and Order, ¶ 26. That point may well be arguable, since no such parameter is found within the text, but it is ultimately irrelevant; it is clear that BI-8 contains a new prohibition on government involvement, and even if that prohibition applies only to "official," as opposed to "personal," views of public officials, it is nonetheless unrelated to the new ballot issue approval procedure proposed in BI-8.

¶49 I believe our decision here is required by *Montanans for Nonpartisan Courts v. Knudsen*, 2025 MT 268, 425 Mont. 51, 579 P.3d 536 (*MNC*), wherein we concluded that the addition of the provision requiring that newly created courts be served by elected judges was a separate purpose from requiring nonpartisan judicial elections which required a separate vote. *See MNC*, ¶ 15.

¶50 I would affirm the Attorney General's rejection of BI-8 on this ground, and thus dissent from the Court's Opinion and Order.

/S/ JIM RICE

Chief Justice Cory J. Swanson joins the Dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON

Chief Justice Cory J. Swanson, dissenting.

¶51 I join Justice Rice's Dissent and write separately to articulate my concern the proposed Ballot Issue 8 (BI-8) impermissibly contains constitutional amendments beyond the proposed initiative power amendment. It amends the judicial power and the constitutional rights of litigants protected in Article II, Sections 16 and 17, of the Montana Constitution. BI-8 therefore contains multiple amendments that are not closely related. I would affirm, in part, the Attorney General's determination.

¶52 BI-8 contains two provisions amending the judicial power and the constitutional rights of litigants, as follows:

> (2)(c) the resolution of legal challenges to the determination made in subsection (2)(b) and the issuance of an approved petition for circulation within 90 days of the initial submission of the ballot issue to the government; and
>
> . . .
>
> (2)(g) the resolution of legal challenges to the qualification of a ballot issue for the ballot prior to the deadline for finalizing ballots for the election.

¶53 Each of these provisions creates a different date-certain deadline for adjudication of cases, and at two different stages. The first deadline addresses the preliminary assessment of whether a proposed ballot issue complies with single subject and ballot statement provisions, which is the stage of litigation we are currently addressing for BI-8. The second deadline addresses a later stage of the ballot qualification process. That is the stage after the ballot issue and statement have been approved, the proponents have conducted signature-gathering and have now presented the ballot and petitions for approval and

23

placement on the ballot. Each stage of this process, and each potential challenge, presents its own issues and arguments to be resolved. So far, so good.

¶54 But the proponents have established in each stage a mandatory deadline for completion of any challenges and any court proceedings addressing the challenges. This certainly makes sense from a proponent's point of view. But doing so necessarily affects the judicial power because the Court has no control over how long it may take the various disputes to reach the Court, no control over how complex and contentious the issues may be, and no control over the susceptibility of the challenges to resolution. Yet the ballot language mandates that no matter how Gordian the legal knot may be, the court proceeding shall be completed within 90 days of the initial submission of the ballot issue to the government (not submission to the Court) for the pre-signature phase, and not later than the ballot submission deadline for the post-signature phase (no matter when the dispute was submitted to the Court). This judicial deadline curtails the judicial power and therefore constitutes an additional constitutional amendment. *MACo*, ¶ 28.

¶55 The same language also amends the Constitution's protection of the legal rights of other individuals, presumably the erstwhile ballot opponents. First, the public has a common law and constitutional right to access the courts. "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. . . . Right and justice shall be administered without sale, denial, or delay." Mont. Const. art. II, § 16. This is not a fundamental right to full and unencumbered access to the courts, and that is not my point. *Meech v. Hillhaven W., Inc.*, 238 Mont. 21, 26, 776 P.2d 488, 491 (1989) (Article II, Section 16, does not create a fundamental right) (overruling

contrary cases). "However, the right to access Montana's legal system is not absolute, and may be limited with the showing of a rational relationship to a legitimate state interest." *Stokes v. First Am. Title Co. of Montana, Inc.*, 2017 MT 275, ¶ 3, 389 Mont. 245, 406 P.3d 439, (citations omitted). My point is the language in BI-8 is necessarily a curtailment and amendment of a future ballot opponent's right to access the courts. Perhaps it may be a constitutionally permissible limitation, but it is a new limitation nonetheless, and therefore an additional amendment beyond the rights of the proponents to enjoy the initiative power.

¶56 The same argument applies to an opponents' rights to due process. "No person shall be deprived of life, liberty, or property without due process of law." Mont. Const., art. II, § 17. The lawsuit-limiting language quoted above presumes the existence of an opponent to a proposed ballot measure. The opponent's right to due process guarantees his or her access to courts to resolve objections to the proposed ballot measure, or objections to the measure's qualification for submission to the electors. "The interest to be protected by due process of the law is the opportunity to be heard." *Byrd v. Columbia Falls Lions Club*, 183 Mont. 330, 332, 599 P.2d 366, 367 (1979).

¶57 The opportunity to be heard constitutes the gravamen of many due process claims; how much opportunity does the Constitution require? The answer is generally a matter of appropriate opportunity and procedure as fairness demands for the occasion. "Although the phrase due process cannot be precisely defined, the phrase expresses the requirements of fundamental fairness." *City of Missoula v. Mountain Water Co.*, 2016 MT 183, ¶ 25, 384 Mont. 193, 378 P.3d 1113 (citations and quotations omitted). This requires courts to be flexible and afford procedural protections appropriate to each case. *State v. Moore*,

25

2018 MT 110, ¶ 13, 391 Mont. 256, 417 P.3d 328. A due process claim may be raised by an allegation of legal process abridgment, *ISC Distributors, Inc. v. Trevor*, 273 Mont. 185, 191, 903 P.2d 170, 173 (1995), or by a court's rigid and unyielding procedural conduct which tramples a litigant's rights. "Due process is flexible and calls for such procedural protections as the particular situation demands. Indeed, the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *State v. West*, 2008 MT 338, ¶ 32, 346 Mont. 244, 194 P.3d 683 (citations and quotations omitted).

¶58 The proponents of BI-8 advance a provision which contains inflexible and universally-applicable court resolution deadlines for every single ballot issue in the future of Montana. But on the other side of every ballot issue lawsuit is an opponent who enjoys a due process right to a fair procedure based on that case's circumstances, so the matter can be fully adjudicated by a court. Without going to the merits of this proposed amendment, because perhaps it is justified in this context, we must recognize the proposed language does amend the due process rights of ballot opponents, and therefore it is another proposed amendment.

¶59 The Opinion and Order cites *MSRR* for the proposition that BI-8 does not create multiple amendments vis-à-vis judicial proceedings because "the provisions of BI-8 operate together to define and safeguard a single constitutional right." Opinion and Order, ¶ 19. But that omits consideration of the court contest over the legality of a proposed ballot initiative; such a proceeding implicates not only the constitutional right of initiative, but also the constitutional rights of access to the courts and due process of law. It is therefore

26

distinguishable from *MSRR*, because BI-8 does not merely further define the judicial priority language in the Constitution (they are correct it does that), but it also goes on to amend the judicial power and amend individual rights of other litigants. *MSRR* presented no such double-amendment affecting other individuals' rights. *MSRR*, ¶ 13.

¶60 The proposed language makes any court proceeding hostage to the conduct of multiple government and proponent/opponent actors before it reaches the Court. BI–8 Section 2(c) starts the clock upon the issue's submission to the government. The Secretary of State and Legislative Services Division must then review the submission. Sections 13-27-216(1)–(3), -218(1)–(3), -225, MCA. Then the measure goes to the budget director for fiscal review and then to the Attorney General for legal sufficiency review. Sections 13-27-216(4)–(6), -218(4)–(6), -226, MCA. If determined legally insufficient, proponents then may challenge the determination in this Court. Mont. Const. art IV, § 7; § 13-27-605, MCA. The time that each stage of review takes is not insignificant. The longer each review stage takes subtracts time from later stages with the ultimate burden falling to the opponents, and the court's consideration being curtailed beyond its own discretion and necessity.

¶61 The current constitutional mandate that courts give "priority" to preelection ballot challenges, Article IV, Section 7(2), or the post-election prohibition on legal challenges to sufficiency of a petition, Article III, Section 4(3), are correctly construed as "procedural constraints" upon the judicial power. Opinion and Order, ¶ 17. So are the provisions in BI-8 quoted above. That alone is not the objection. The objection is that they are constitutional amendments in addition to the establishment of a new fundamental right of

27

initiative in the proposed ballot language. They are not just measures susceptible to the "theoretical ability to subdivide a measure," Opinion and Order, ¶ 13. They are distinct and separate amendments of the judicial power and individual rights, that "require[] voters to accept sweeping constitutional changes beyond its stated objective." Opinion and Order, ¶ 13 (citing *TEI*, ¶¶ 11, 14).

¶62 Just as in *MNC*, we invalidated a proposed ballot issue that contained two distinct constitutional questions—partisan judicial elections and mandating elections of all future judges, *MNC*, ¶¶ 10, 15—here we should invalidate a proposed ballot issue that establishes and safeguards a proponent's initiative rights while also amending the judicial power and constitutional rights of opponents. Those are (at least) two different issues, requiring the voters to make separate choices on each. Voters could easily favor the initiative right and procedural protections while opposing amendments to legal review and opponents' access to courts. They present two different questions, and two different amendments. The Court errs today in permitting the proponents to logroll them together into a single question.

¶63 Limiting the power of this Court to control the timeline of ballot issue cases, and amending the individual rights of litigants to challenge the measures, are unrelated and unnecessary to the purpose of ensuring the government refrain from burdening the right of the people to exercise their powers of initiative and referendum.

¶64 I respectfully dissent and would affirm in part the Attorney General's disallowance of BI-8 on the grounds that it constitutes multiple constitutional amendments.

/S/ CORY J. SWANSON